



## OPINION

No. 04-11-00448-CV

**IN THE INTEREST OF E.A.G.**, Y.M.G., C.G.G., V.G.G., S.G., and D.A.G., Minor Children

From the 406th Judicial District Court, Webb County, Texas
Trial Court No. 2009-CVJ-001832-D4
Honorable Paul Gallego, Judge Presiding

Opinion by:     Phylis J. Speedlin, Justice

Sitting:        Phylis J. Speedlin, Justice
                Steven C. Hilbig, Justice
                Marialyn Barnard, Justice

Delivered and Filed:  February 29, 2012

AFFIRMED

Yesenia G. and Alfonso G. appeal from the trial court's order terminating their parental

rights to their minor children.  Each parent filed a brief and each advances several arguments as

to why the trial court erred in rendering the termination order based on the jury's findings.  We

affirm the judgment of the trial court.

## BACKGROUND

Yesenia had two children, E.G. and Y.G.,[1] before she met and married Alfonso.  Her

marriage to Alfonso produced four more children: C.G., V.G., S.G., and D.G.[2]  In June 2009,

---

[1] To protect the privacy of the parties in this case, we identify the children by their initials and the parents by their first names only.  *See* TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2011).  The style of the case reflects the initials of the minor children as they appeared in the final judgment; however, the parties and the witnesses refer to the children by an abbreviated version of their initials, and we do the same in this opinion.

Y.G. alleged that her stepfather fondled her and that her mother was physically abusive, and the children were removed from their parents' care. Y.G. later recanted as to the sexual abuse and the children were returned home on the condition that Alfonso not remain in the home. Thereafter, in November 2009, Y.G. and E.G. alleged that Yesenia threatened to set fire to the family home with the younger children inside. The children were again removed from the home, and the Department of Family and Protective Services ("the Department") filed a petition seeking to terminate Yesenia's parental rights to all six of her children and Alfonso's parental rights to his four children. The termination suit was based on allegations that Alfonso sexually abused Y.G. and that Yesenia was physically abusive to all the children.

A six-day jury trial was held in April 2011. The Department called several witnesses to testify, including Yesenia and Alfonso, Y.G., and several Department caseworkers and counselors. At the conclusion of trial, the jury found by clear and convincing evidence that both Yesenia's and Alfonso's parental rights to all the children should be terminated. The trial court rendered a final order terminating their parental rights as to all the children pursuant to the jury's findings under section 161.001(1)(D), (E) and (O) of the Texas Family Code, and a finding that termination of Yesenia's and Alfonso's parental rights is in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(1), (2) (West Supp. 2011). The order appointed the Department sole managing conservator of the children.

### JURY TRIAL

The following evidence was presented at trial. Diana Perez testified that she was at her boyfriend's home on the night of June 5, 2009, when Y.G. arrived on her bicycle and asked to speak to her friend Karina. Y.G. was crying and told Perez that she wanted to spend the night

---

[2] At the time of trial in April 2011, E.G. was 14 years old; Y.G. was 13 years old; C.G. was 5 years old; V.G. was 4 years old; S.G. was 3 years old; and D.G. was 1 year old.

because her mother hit her on the head and treated her like a maid. Y.G. also stated that her stepfather would touch her on her private parts. She further told Perez that her eldest brother was mistreated, and that her parents did not want her or her brother. Perez called the police.

Police officer Jacqueline Siegfried responded to Perez's call. Siegfried stated that Y.G. told her that she did not want to be at home because she was repeatedly hit on the head and treated like a maid, and because her stepfather touched her inappropriately while her mother was away playing bingo. Siegfried did not observe any physical markings or bruises on Y.G.'s body. Siegfried called CPS[3] and told them about the allegations of abuse. Siegfried accompanied Y.G. and the Department caseworker, Natalie Hernandez, to Y.G.'s home so that Hernandez could question Yesenia and Alfonso.

Natalie Hernandez testified that when she first arrived on June 5, 2009, Y.G. was nervous and crying and appeared to be panicked. Based on the allegations of physical and sexual abuse, Hernandez determined that it was best for all five[4] of the children to be removed from the home. They were placed in the care of Alfonso's sister. Hernandez categorized the cases as "unable to determine," meaning she could not determine whether the children were physically or sexually abused. The children were returned to their home a month later with the condition that Alfonso not be allowed in the home and not have any contact with Y.G.; he was permitted supervised visits with the other children.

Guadalupe "Lupita" Martinez, a forensic interviewer at the Children's Advocacy Center, testified regarding an interview she conducted with Y.G. on June 5, 2009. The interview was conducted in Spanish and was video recorded; the video was admitted and played for the jury, who was also given a copy of the English translation. In the video, Y.G. states that her mother

---

[3] Siegfried, like many of the witnesses, refers to the Department by its former acronym, "CPS."

[4] Yesenia was pregnant with D.G. at the time.

treats her badly and makes her pick up things around the house; she is sometimes sent to her room as punishment. Y.G. stated that Yesenia hit her and threw a plastic "sippy cup" at her face which made her bleed two days before the interview. Y.G. also stated that Yesenia hit her with a slipper and pulled her hair. When Y.G. was in third grade, her mother hit her with a piece of wood. She stated that her mother began treating her this way when they began living with her stepfather. She stated that her mom sometimes spanks her with a belt, and that one time she choked Y.G. with her hands and told Y.G. that she did not matter to her.

In the video, Y.G. states that Yesenia also spanked E.G. with a belt; she once spanked him "on his middle part." Yesenia also pulled E.G.'s hair. Y.G. claimed that Alfonso was often present when this behavior occurred but failed to stop it. Yesenia also pinched Y.G.'s younger sister so that she would go to sleep. She stated that both Alfonso and Yesenia spank her younger siblings with their hands, and that they sometimes remove the underwear beforehand. Alfonso hits Y.G. with his hand, and it sometimes leaves a bruise.

When asked whether she had ever been forced to do anything she did not want to do, Y.G. answered that her mother sometimes makes her wash the dishes and clean the house. When asked whether anyone has ever touched her body in a way that made her uncomfortable, Y.G. answered that her stepdad touched her over and under her clothes. She stated that the touching occurred when she was putting her brothers[5] to sleep. The touching occurred on three occasions, once when her mom was in the hospital while pregnant with S.G. and the others when her mom was playing bingo. Once her stepdad took her hand and placed it under his shorts. She felt hair and "something sticky."

Y.G. was also called to the witness stand. She testified that after her mother met Alfonso, she and E.G. lived with their grandmother for about a year and half while Yesenia went to live

---

[5] Y.G. only had one younger brother at the time.

with Alfonso. Once they were all living together, Alfonso would punish E.G. by making him kneel on bottle caps. Yesenia did not attempt to stop this treatment unless she was mad at Alfonso. Yesenia would discipline E.G. by hitting him with hangers or belts. Once, Yesenia repeatedly hit E.G. with a piece of wood after he accidentally broke a table. If Y.G. tried to interfere, her mother hit her as well. Y.G. recalled that her mother and stepfather once told her there was a witch outside, and then made her go throw rotten food outside at night. When Y.G. returned to the house, crying, she found the door was locked. She overheard Alfonso saying, "tell that little girl to be quiet." Her mother opened the door and grabbed Y.G.'s wrists, and told her and E.G. to go to their room. Yesenia would also discipline Y.G. by pulling her hair or making her kneel on rice. At that time, Alfonso told Yesenia to stop making the children kneel on rice.

Y.G. claimed her mother was not abusive to her younger siblings, except as to V.G. She once saw her mother forcing V.G. to eat even though she was sick, and when V.G. vomited, Yesenia pushed her chair and V.G. fell down with the chair. Y.G. once got mad at her mother and asked why she treated C.G. as her favorite child. Yesenia denied having a favorite, and pulled C.G.'s hair and sent him to his room to prove her point. Y.G. was asked whether C.G. had done anything to provoke this reaction from Yesenia, and Y.G. answered, "[n]o. He was just jumping on the bed and hitting me." Y.G. never saw Alfonso hit her younger siblings, and Alfonso did not like Yesenia to hit them either.

Y.G. was required to help clean the family's home, and when her mother was mad and refused to feed the babies, Y.G. would sometimes cook as well. E.G.'s chore was to collect cans for recycling, and when he did not do it the right way, Yesenia hit him on the back with a shovel.

Alfonso did not try to stop this. According to Y.G., this type of disciplinary action never occurred in front of the younger children.

Y.G. recounted running away from home on June 5, 2009 because E.G. and Alfonso were fighting and Yesenia would not intervene to stop them. After the police were called, she was taken to the Children's Advocacy Center for an interview. At that time, she said that Alfonso had touched her inappropriately on three occasions—once while her mother was in the hospital and the others while her mother was away playing bingo. The Department removed her and her siblings from the home and sent them to live with Alfonso's sister. Y.G. explained that Alfonso's family did not believe that Alfonso would sexually abuse anyone, and because she did not want Alfonso's family to hate her, Y.G. later recanted and said that she had lied about the sexual abuse. When she was returned to her mother's home, Y.G. tried to tell Yesenia what had really happened, but Yesenia just said, "I don't know anything, I don't want to hear about it." Y.G. stated that her three[6] younger siblings were asleep in the same bedroom when Alfonso inappropriately touched her.

Y.G. then recounted an argument she had with her mother in November 2009. Y.G. was slouching as she was eating dinner and watching television, and Yesenia told her to sit up straight and stop sitting like a lesbian. Yesenia then said she wanted to leave the stove on with the gas burning while Y.G. and E.G. were at school and Alfonso was at work so that the house would burn down with the babies in it. Alfonso, who was present, then reminded Yesenia that she used to talk about wanting to shoot Y.G. in the head. Y.G. and E.G. told their school counselor about this incident, which led to the Department removing the children from their home a second time.

---

[6] D.G. was not yet born.

Y.G. stated that she ran away from foster care at least four times; one foster mother hit the foster kids and called the kids bad names; another foster mother hit a baby and also tried to hit Y.G. Y.G. admitted to using marijuana and heroin while in the Department's custody. Y.G. denied taking or having someone else take provocative photos of herself that were posted to the internet. Y.G. stated that she does not want to go back home with her mother.

Claudia Herrera was the Department caseworker assigned to the family's case in November 2009. Herrera prepared a family service plan detailing the ten tasks Alfonso and Yesenia needed to complete to regain custody of their children. The plan required them to: (1) attend individual counseling and obtain a favorable recommendation regarding reunification from the therapist; (2) attend parenting classes and provide their caseworker with proof of completion; (3) complete a psychosocial evaluation and a psychological evaluation if further recommended; (4) complete substance abuse counseling; (5) participate in supervised family visits; (6) maintain appropriate housing; (7) maintain legal employment; (8) abstain from participation in criminal activity; (9) provide child support; and (10) cooperate with the Department and complete all services outlined in the family service plan. Herrera testified that Yesenia and Alfonso failed to complete the first requirement because the counselor did not give them a positive recommendation for reunification.[7] Herrera explained that the couple had three different counselors. They stopped seeing the first counselor, San Juanita Hernandez, because they requested a new one. Their second counselor, Luis Flores, recommended that the parents be reunified with the four youngest children after two counseling sessions; the Department, however, did not agree with Flores's recommendation, so it assigned a new counselor, Lisa Cervantes, to the couple. Cervantes ultimately did not recommend family reunification.

---

[7] Herrera also stated that the parents failed to undergo psychological evaluation; however, based on uncontradicted testimony that the Department failed to arrange for the testing, the trial court granted a directed verdict on that ground in favor of the parents.

Finally, Herrera testified that she visited the family's home and determined that it was clean and that there was plenty of food and water. The couple visited their children weekly. Herrera was concerned that Yesenia and Alfonso ignored Y.G. and E.G. during these visits and mostly interacted with the younger children. Herrera noted that the younger children were happy to see their parents during the supervised visits, and ran up to them, hugged them, and jumped in their laps.

Alfonso was called as an adverse witness by the Department. He denied making E.G. kneel on bottle caps as punishment. Alfonso admitted spanking E.G. with his hand because E.G. hit him first, but denied pinching his thighs or otherwise physically abusing E.G. Alfonso stated that a police officer and a teacher recommended that he spank E.G. due to his aggressive behavior. Alfonso stated that he attended approximately eight counseling sessions with Luis Flores, not two as Herrera testified, and learned that a more appropriate punishment was to send E.G. to his room or prohibit him from watching television. When E.G. was sent to his room, he sometimes destroyed things, such as breaking the window or throwing shoes.

Alfonso remembered Yesenia going to play bingo on two occasions in 2009. All the children stayed with him while Yesenia played bingo. Alfonso stated that he took Yesenia to the hospital in May 2009 when she complained of pregnancy pains; he stayed with her during the half-day that she was in the hospital and the children waited with him. Alfonso denied touching Y.G.'s breasts, crotch, or backside, and also denied making her touch his crotch. Alfonso stated that on at least three occasions after her initial outcry, Y.G. told her mother that she had lied about the accusations against him.

On the witness stand, Yesenia denied any physical abuse of the children by her or by Alfonso, but acknowledged that E.G. had accused Alfonso of hitting him on the head with his

knuckles. Yesenia recalled telling Y.G. and E.G. that her own mother had disciplined her by making her kneel on bottle caps and rice, and believed that is why they claimed E.G. was made to kneel on bottle caps. None of the children were ever treated by a physician or taken to the hospital for injuries, and the Department caseworkers did not observe any physical markings on the children at the time they were removed from the home; Yesenia, however, stated she did observe marks on the children while they were in the Department's custody.

Yesenia stated that since Y.G. has been in the Department's custody, she has run away from her foster home on many occasions, and each time she has gone back to Yesenia and Alfonso. Y.G. told Yesenia that she did not want to be adopted and that the accusations she made against Alfonso were false. Y.G. told Yesenia that CPS pressed her to say that Alfonso fondled her. Yesenia also believed that Y.G.'s friend, Karina, told her to make up lies about Alfonso touching her. Yesenia did not permit Y.G. to associate with Karina because she was sexually promiscuous. Y.G. resented the fact that she was not allowed to see Karina and told her parents that they would regret not allowing her to see Karina for the rest of their lives. Y.G. showed Yesenia provocative photographs of herself that were posted online.

Yesenia felt anguish at being separated from her children for the past year and a half. The visitations with her children went well, and Y.G. would sit next to Alfonso. E.G. expressed to Yesenia his desire to return home, even stating that if he were adopted, he would move back home when he turned 18.

Lisa Cervantes is a licensed professional counselor. The family was referred to her by the Department in April 2010 and she testified regarding her counseling sessions with the family. Although Yesenia and Alfonso never missed a scheduled counseling session, Cervantes did not give Yesenia and Alfonso a favorable recommendation for reunification based on what she

perceived as inconsistencies throughout the course of treatment and based on her view that they failed to accept responsibility for their actions.

Cervantes described a counseling session with Yesenia and Y.G. where Y.G. told her mother about the sexual abuse by Alfonso. In a subsequent session, Yesenia told Cervantes she did not believe Y.G. because Y.G. was a liar.

Cervantes stated that Y.G. told her that the younger siblings were not physically abused. Cervantes was not aware of any evidence, such as medical records or documentation from caseworkers, indicating that the younger children had been physically abused. State's Exhibit 8 was admitted, which was the final letter Cervantes submitted to the Department with her recommendation against family reunification.

Kimberly Brewer, the Department representative, testified that the family did not complete the family service plan because they failed to receive a favorable recommendation for reunification from Cervantes. Brewer observed that during the supervised visitations Y.G. interacted with both parents, and even sat next to Alfonso; all children were happy to see their parents and hugged them; the parents brought toys and games and snacks for the children and once brought a birthday cake; the family prayed together and Alfonso would sing to the children. During her home visit assessment, Brewer noted that the home was clean and appropriate. Nonetheless, Brewer stated the Department was concerned that if the younger children were returned home they might be subject to abuse or neglect.

Deyanira Garza, an investigator with the Laredo Police Department, was assigned to investigate the sexual abuse allegation made by Y.G. Garza interviewed both Alfonso and Yesenia and reviewed Dr. Gregorio Pina's[8] findings, in which he concluded Y.G. had lied about the accusation. She stated that the police investigation was closed due to insufficient evidence of

---

[8] Dr. Pina is a psychologist at the Children's Advocacy Center who evaluated Y.G.; he was not called to testify.

abuse. On cross-examination, Garza acknowledged that victims of sexual abuse sometimes recant.

The final piece of evidence presented to the jury was a video recording of the forensic interview of E.G. conducted in Spanish and its English translation offered by Yesenia. Just like Y.G., E.G. was interviewed by Lupita Martinez at the Children's Advocacy Center when he was removed from his home on June 5, 2009. When asked whether he knew why he was at the Center, E.G. replied that it was because his sister [Y.G.] escaped. He further stated that she was mad because their parents sent her to do the dishes, and that, supposedly, they hit her, "but they didn't because I saw." E.G. stated that Y.G. ran away from home on other occasions because she did not want to wash the dishes or was mad that her parents send her to bed early. When asked why his sister [Y.G.] always wants to run away, E.G. replied, "[b]ecause she doesn't like to be reprimanded." He is then asked what happens when he is reprimanded; E.G. answered that sometimes they [his mother and stepfather] say bad words. He stated that his mother sometimes gets mad and hits him with a belt; his stepfather sometimes hits him with his hand or with a slipper; the slipper does not hurt.

E.G. stated that when his mother plays bingo he stays home with Alfonso, Y.G. and his younger siblings, C.G., V.G., and S.G. On those occasions, Y.G. would put the younger children to bed, and Alfonso stayed in the living room or would cook in the kitchen. He stated that he does not get along with Alfonso, and does not like to be punished by being sent to his room. E.G. stated that Alfonso does not hit the younger children or Y.G. He further stated that only Yesenia hits Y.G. with her hand, and that once she hit her with a cable for skipping school. His parents tell him to: always behave, not do bad things, not get into drugs, and study and get good grades. When asked whether he knew anyone who had been inappropriately touched, E.G.

replied that his sister's friend, Karina, had. He stated that his mother did not want Y.G. to hang out with Karina.

**SUFFICIENCY OF EVIDENCE FOR
INVOLUNTARY TERMINATION OF PARENTAL RIGHTS**

Yesenia first argues that the evidence is legally and factually insufficient to support the jury's verdict and termination of her parental rights as to E.G. and Y.G., and legally insufficient to support the jury's verdict and termination of her parental rights as to her younger children, C.G., V.G., S.G., and D.G. Alfonso likewise contends that the evidence is legally insufficient to support the jury's findings in support of involuntary termination of his parental rights to his four biological children, C.G., V.G., S.G., and D.G. Neither Yesenia nor Alfonso challenge the best interest findings on appeal. *See* TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2011).

*Applicable Law and Standard of Review*

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Accordingly, we strictly scrutinize termination proceedings and strictly

construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20-21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

Parental rights may be terminated only upon proof of clear and convincing evidence that the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code, and that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1), (2) (West Supp. 2011); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *J.O.A.*, 283 S.W.3d at 344 (quoting TEX. FAM. CODE ANN. § 101.007 (West 2008)). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification of conservatorship order).

When a parent challenges the legal sufficiency of the evidence:

[A] court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*In re J.F.C.*, 96 S.W.3d at 266.

- 13 -

By contrast, when factual sufficiency of the evidence is challenged, "only then is disputed or conflicting evidence under review." *In re J.O.A.*, 283 S.W.3d at 345. In reviewing termination findings for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

### *Statutory Grounds for Termination*

Section 161.001 of the Family Code provides that a court may terminate the parent-child relationship if it determines the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
>
> * * *
>
> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

TEX. FAM. CODE ANN. § 161.001(l)(D), (E), (O) (West Supp. 2011). Here, the jury found by clear and convincing evidence that Yesenia and Alfonso violated each of these subsections of the Family Code. Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Because Yesenia and Alfonso do not

- 14 -

challenge the best interest findings, we must uphold the finding of termination if the evidence is sufficient to support any of the three predicate grounds alleged. *See Hann v. Tex. Dep't of Protective and Regulatory Servs.*, 969 S.W.2d 77, 81 (Tex. App.—El Paso 1998, pet. denied).

### *Dangerous Environment Under Subsection 161.001(1)(D)*

Endanger "means to expose to loss or injury, to jeopardize." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Although endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffers injury. *In re J.O.A.*, 283 S.W.3d at 345 (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under subsection 161.001(1)(D), the inquiry is related to whether the environment of the children is the source of endangerment to the children's physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d at 125; *see also In re R.D.*, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied) (differentiating between subsections (D) and (E)). It focuses on the suitability of the child's living conditions or surroundings. *In re J.A.J.*, 225 S.W.3d 621, 627 (Tex. App.—Houston [14th Dist.] 2006), *aff'd in part, rev'd in part on other grounds*, 243 S.W.3d 611 (Tex. 2007). Generally, the conduct of a parent or others in the home can produce dangerous surroundings or circumstances sufficient to support termination under subsection (D). *Id.* at 626 n.7.

### *Conduct Under Subsection 161.001(1)(E)*

The inquiry under subsection 161.001(1)(E) relates to whether the endangerment of the child is the direct result of the parent's conduct. *See In re J.T.G.*, 121 S.W.3d at 125 (holding evidence sufficient to support finding that parent violated subsections 161.001(1)(D) and (E) given evidence of continued drug use, domestic violence, and suicide attempt); *In re R.D.*, 955

S.W.2d at 368-69 (affirming finding of endangerment under subsection 161.001(1)(E) where evidence showed that, over a two-year period, parents were in and out of jail, failed to attempt to comply with parenting service plan, and used drugs). Termination under subsection 161.001(1)(E) must be based on not just a single act or omission, but a voluntary, deliberate, and conscious course of conduct by the parent. *In re J.T.G.*, 121 S.W.3d at 125. To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child nor is the child required to actually suffer injury. *Boyd*, 727 S.W.2d at 533 (reversing appellate court's holding that father's imprisonment did not endanger the emotional and physical well-being of child and remanding for a determination of whether the State met its burden by clear and convincing evidence).

### Mother's Sufficiency Challenge

Yesenia argues that no evidence was presented at trial to show that she mentally or physically abused Y.G. and E.G., aside from Y.G.'s testimony which was not credible because she recanted the allegations of sexual abuse and committed perjury on the stand. Yesenia contends that E.G. confirmed his sister lied when he stated that Yesenia did not hit Y.G. before she ran away from home on June 5, 2009. Although Y.G.'s testimony was contradicted by other witnesses, the jury was free to make their own credibility assessments, resolve conflicts in the testimony, and decide what weight to give the witnesses' testimony. *See In re J.L.*, 163 S.W.3d 79, 86-87 (Tex. 2005) (jury is the "sole arbiter when assessing the credibility and demeanor of witnesses"). Thus, the jury was free to believe Y.G.'s testimony that her mother physically abused her and E.G. on many occasions. Applying the appropriate standards of review, we conclude that, given Y.G.'s testimony, the evidence is legally and factually sufficient to permit the jury to form a firm belief or conviction that, under subsection 161.001(1)(E), Yesenia

engaged in conduct that endangered the physical and emotional well-being of Y.G. and E.G. *See* TEX. FAM. CODE ANN. § 161.001(l)(E).

Yesenia similarly argues that there is no evidence that the four younger children were subjected to physical or emotional harm. She references testimony indicating that the children were never treated for any physical injuries and that the Department never observed any signs of abuse or neglect. Based on the evidence of physical abuse that Yesenia perpetrated on Y.G. and E.G., however, we conclude that Yesenia engaged in a course of conduct which endangered the younger children under subsection 161.001(1)(E). Abusive conduct by a parent in the home may produce an environment that endangers the physical or emotional well-being of a child in the home. *See In re J.O.A.*, 283 S.W.3d at 345 (endangering conduct is not limited to actions directed towards the child); *In re J.T.G.*, 121 S.W.3d at 125. Thus, a parent's abuse of other children in the home can support a finding of endangerment. *See In re J.O.A.*, 283 S.W.3d at 346; *In re J.T.G.*, 121 S.W.3d at 125. In addition, the testimony that Yesenia threatened to set the house on fire with the younger children inside is further evidence of endangerment. Even though D.G. was not born at the time termination proceedings began, endangering conduct may include a parent's actions prior to the child's birth. *See Boyd*, 727 S.W.2d at 533. Thus, we conclude the evidence is legally sufficient to permit the jury to form a firm belief or conviction that, under subsection 161.001(1)(E), Yesenia engaged in conduct which endangered the physical or emotional well-being of C.G., V.G., S.G., and D.G. *See* TEX. FAM. CODE ANN. § 161.001(l)(E). Yesenia's first issue is therefore overruled.

*Father's Sufficiency Challenge*

The Department primarily based its case against Alfonso on the fact that Alfonso sexually abused Y.G., and that two or three[9] of the younger children were asleep in the room when Alfonso sexually assaulted Y.G. Although there was no testimony that Alfonso directly harmed the younger children, we agree that his sexual abuse of Y.G., which under the applicable standard of review we must accept as true, endangered Alfonso's children, including any unborn children.

Sexual abuse is conduct that endangers a child's physical or emotional well-being. *See In re A.B.*, 125 SW.3d. 769, 775 (Tex. App.—Texarkana 2003, pet. denied); *In re R.G.*, 61 S.W.3d 661, 667 (Tex. App.—Waco 2001, no pet.), *disapproved on other grounds*, 96 S.W.3d 256 (Tex. 2002); *In re King*, 15 S.W.3d 272, 276 (Tex. App.—Texarkana 2000, pet. denied), disapproved on other grounds by *In re C.H.*, 89 S.W.3d 17 (Tex. 2002). Sexual assault of a child in the home is conduct we may infer will endanger the physical and emotional well-being of other children in the home who may either discover the abuse or be abused themselves. *In re R.W.*, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied); *In re King*, 15 S.W.3d at 276. Thus, Alfonso's sexual abuse of Y.G. created surroundings that endangered the younger children in the household, including any unborn children. *See Director of the Dallas Cnty. Child Protective Servs. v. Bowling*, 833 S.W.2d 730, 734 (Tex. App.—Dallas 1992, no writ) (treating evidence of sexual abuse of older son as evidence of endangerment of child not yet born at the time); *see also Lucas v. Tex. Dept. of Protective & Regulatory Servs.*, 949 S.W.2d 500, 503 (Tex. App.—Waco 1997, pet. denied), overruled on other grounds by *In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002) (holding father's sexual abuse of one child endangered all of his children living in the home at

---

[9] There is some confusion as to whether Yesenia was pregnant with S.G. or D.G. at the time one of the alleged instances of sexual abuse occurred.

the time abuse occurred); *see also In re Baby Boy R*., 191 S.W.3d 916, 925 (Tex. App.—Dallas 2006, pet. denied), *cert. denied*, 549 U.S. 1080 (2006) (noting that a parent's conduct toward a stepchild will suffice to support termination of parental rights of another child).

Looking at the evidence in the light most favorable to the jury's finding, we therefore hold the evidence is legally sufficient to permit the jury to form a firm belief or conviction that, under subsection 161.001(1)(E), Alfonso's sexual abuse of Y.G. endangered the physical or emotional well-being of C.G., V.G., S.G., and D.G.  *See* TEX. FAM. CODE ANN. § 161.001(l)(E). Thus, we overrule Alfonso's fourth issue.

Because we hold the evidence is sufficient to support the findings under subsection 161.001(1)(E) as to Yesenia and Alfonso, we need not address the other grounds for termination under subsections 161.001(1)(D) and (O).

### EVIDENTIARY OBJECTIONS

*Testimony of Lisa Cervantes*

In her second issue, Yesenia argues that the trial court erred in allowing Lisa Cervantes to testify as to the veracity of Y.G.  During trial, the respondents objected to Lisa Cervantes' testimony that she, as an expert, believed that Y.G. was telling her the truth.  The court sustained the objection, and instructed the Department to advise Cervantes that she was not permitted to say, "I believed her," meaning Y.G.  Despite this warning, the following occurred during cross-examination of Cervantes by Alfonso's counsel:

> Q:    But you're not aware of any evidence that any of the four children were ever physically harmed; is that correct?
>
> A:    Other than the fact that I believed what [Y.G.] was telling me.

Yesenia immediately objected; Alfonso joined the objection and asked the court to instruct the jury to disregard the answer.  The Department responded that the court had instructed Cervantes

not to say that she believed the sexual abuse, but Cervantes was asked about physical abuse; therefore, the response was solicited.  Alfonso's counsel again objected that Cervantes' answer was nonresponsive and asked that it be stricken; Yesenia's attorney also asked for an instruction to disregard.  The trial court overruled the objections and denied the instruction to disregard.

The admission or exclusion of evidence rests within the sound discretion of the trial court.  *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995).  A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to any guiding rules and principles.  *Mercedes–Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996).  To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was in error, and the error (1) probably caused the rendition of an improper judgment or (2) probably prevented the appellant from properly presenting the case to the court of appeals.  TEX. R. APP. P. 44.1; *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).  In determining if the excluded evidence probably resulted in the rendition of an improper judgment, we review the entire record, and, "[t]ypically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted."  *Interstate Northborough P'ship*, 66 S.W.3d at 220.  Ordinarily, we will not reverse a judgment because a trial court erroneously excluded evidence when the evidence in question is cumulative and not controlling on a material issue dispositive to the case.  *Id*.

Here, we agree the trial court erred in failing to strike Cervantes' answer and in failing to instruct the jury to disregard her response after specifically ruling that Cervantes was not permitted to say, "I believed her."  However, after reviewing the entire record, we cannot say the error probably caused the rendition of an improper judgment.  *See* TEX. R. APP. P. 44.1.  The jury

heard testimony from Y.G. regarding the repeated physical beatings by Yesenia that she endured. This evidence alone was sufficient to permit the jury to form a firm belief or conviction that Yesenia committed an act prohibited by section 161.001(1) of the Family Code.[10] Therefore, we overrule Yesenia's second issue.

Alfonso additionally raises two issues as to Cervantes, complaining that Cervantes should not have been permitted to testify at all because (1) she did not qualify as an expert under the *Nenno*[11] test and (2) she admitted having no personal knowledge of any physical abuse of the four younger children. Because Cervantes had no personal knowledge that any of the children were abused, Cervantes' testimony went only to best interest and Alfonso does not challenge that finding on appeal. Accordingly, Alfonso's first and second issues are overruled.

### *Untimely Discovery – Admission of Evidence*

Yesenia also argues that the trial court erred in allowing the Department to call Cervantes as an expert because, although she was timely disclosed, the Department failed to provide her curriculum vitae and her reports until the day of trial in violation of Rule 193.6 of the Texas Rules of Civil Procedure and the Webb County Local Rules. *See* TEX. R. CIV. P. 193.6(a). The trial court permitted Cervantes to testify, stating that she has been the parents' counselor for some time, "and there is no surprise that she has information relating to this case."

Rule 193.6 states that if a party fails to make a timely discovery response, the evidence not timely disclosed may be excluded at trial unless the court finds that the failure to respond did not unfairly surprise or unfairly prejudice the other party. *Id.* The trial court has discretion to

---

[10] Yesenia and Alfonso do not challenge the evidence supporting the best interest findings on appeal.

[11] *See Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998). In *Nenno*, the Court of Criminal Appeals stated that when addressing fields that are based upon experience or training as opposed to scientific methods, i.e., "soft science," the appropriate questions for assessing reliability are (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of the field, and (3) whether the expert's testimony properly relies upon or utilizes the principles involved in the field. *Id.* at 561.

determine whether the offering party met its burden.  *Bellino v. Comm'n for Lawyer Discipline*, 124 S.W.3d 380, 383–84 (Tex. App.—Dallas 2003, pet. denied).  Here, we cannot say the trial court abused its discretion in finding that Yesenia was not surprised by the evidence because the record shows Cervantes was the parents' counselor prior to trial.

Yesenia also contends the trial court erred in admitting State's Exhibit 8, a letter written by Cervantes on September 20, 2010 which states that Cervantes is not giving the family a favorable recommendation for reunification.  Yesenia again objected on the basis of Rule 193.6, arguing that the letter was not timely produced in discovery.  We do not, however, agree that the error, if any, in admitting the letter was harmful.  The Department used the letter to show that Yesenia and Alfonso did not complete the court-ordered family service plan because they failed to receive a favorable recommendation for reunification.  As we have already held that the evidence is sufficient to support the findings of termination under subsection 161.001(1)(E), we did not address subsection (O), and any error in admitting the letter was therefore harmless.  *See* TEX. R. APP. P. 44.1.  Thus, we overrule Yesenia's third and fourth issues.

In her seventh issue, Yesenia contends the trial court abused its discretion in admitting the testimony of Diana Perez, Officer Jacqueline Siegfried, Natalie Hernandez, Guadalupe Martinez, Gabriella Guajardo,[12] Kimberly Brewer, and Deyanira Garza because they were not timely disclosed and identified pursuant to Rules 194 and 193.6.  *See* TEX. R. CIV. P. 194, 193.6.  The Department responds that Yesenia failed to preserve error because she stipulated to these witnesses, and her objections were untimely given that Perez, Siegfried, Hernandez, Martinez, and Guajardo had already testified by the time she objected.  In addition, Garza was called by Alfonso, and Brewer was permitted to testify as the representative for the Department.  We agree that Yesenia failed to preserve error as to these witnesses, and overrule her seventh issue.

---

[12] Guajardo did not testify in front of the jury.

Lastly, Alfonso generally complains that the trial court erred in allowing the Department to introduce evidence that was not provided to him in discovery, in violation of Rule 191.5. *See* TEX. R. CIV. P. 191.5 ("Every disclosure, discovery request, notice, response, and objection required to be served on a party or person must be served on all parties of record."). He asserts that the Department failed to serve any of its discovery responses on him. He does not, however, contend that he was harmed by the Department's failure to serve him with its discovery responses. Absent a showing of harm, we will not reverse the judgment of the trial court. *See* TEX. R. APP. P. 44.1. Alfonso's third issue is overruled.

### *Videotaped Interview of Y.G.*

In her fifth issue, Yesenia contends the trial court abused its discretion in allowing the Department to play the videotaped interview of Y.G., which was conducted in Spanish, before the jury. She argues that the interview was not properly translated by a certified licensed translator. *See* TEX. R. EVID. 1009(a) ("A translation of foreign language documents shall be admissible upon the affidavit of a qualified translator setting forth the qualifications of the translator and certifying that the translation is fair and accurate."). Additionally, she contends the translation was not provided to her until the week of trial. *See id.* (requiring service of translator's affidavit upon all parties at least 45 days prior to trial). As to the admissibility of the video itself, Yesenia argues that it was improper bolstering to first play the video and then permit Y.G. to take the stand. In essence, she contends the video bolstered Y.G.'s credibility since it was not subject to cross-examination.

The Department responds that the video was properly admitted under sections 104.002 and 104.006 of the Family Code as a statement of a child twelve years old or younger alleging abuse. *See* TEX. FAM. CODE ANN. § 104.002 (West 2008); *id.* § 104.006 (West 2008) (permitting

admission of child's statement if the trial court finds it reliable and the child testifies in court). Further, the Department contends that Yesenia waived any objection to the translation because she moved to introduce E.G.'s interview and translation to the jury; E.G.'s interview was translated by Gabriella Guajardo, who also translated Y.G.'s interview.

We agree that Yesenia waived any complaint regarding the translation when she moved to introduce the video of E.G.'s forensic interview and translation by the same translator. We thus overrule Yesenia's fifth issue.

### *Exclusion of Impeachment Evidence*

Next, both Yesenia and Alfonso argue that the trial court erred in preventing cross-examination of Y.G. as to whether she committed perjury on the witness stand when she denied taking and posting provocative photographs of herself on Facebook. In the same vein, Yesenia argues in her eighth issue that the trial court erred in excluding Respondent's Exhibit 14, the printouts of the photographs of Y.G. which were posted to the internet. During trial, Y.G. testified on direct examination about the time she ran away from her foster home and denied showing Yesenia provocative photographs of herself posted to the internet. Y.G. further testified that if her mother testified to the contrary, her mother was lying. Thereafter, Yesenia and Alfonso sought to impeach Y.G. by cross-examining her about her denial and the photographs, and by introducing numerous sexually provocative photographs of Y.G. posted to her Facebook page with captions such as "Ima sexy bytch" and "Kiss my ass." The trial court restricted the cross-examination and excluded the photographs, stating that the only purpose would be to impeach Y.G.'s credibility and she had already impeached herself with respect to her outcry and her several admitted recantations after the outcry; the court also found the Facebook photographs were more prejudicial than probative. Yesenia and Alfonso preserved error by making a joint

bill of exception in which Y.G. admitted that she had taken the photographs and that she lied to the jury about it.  Yesenia and Alfonso argue that the trial court's refusal to admit the photographs and to permit cross-examination on them prohibited them from showing the jury that Y.G. had committed perjury.  They assert that, without this evidence, the jury could not properly assess Y.G.'s credibility.

We review the exclusion of evidence for an abuse of discretion.  *Alvarado*, 897 S.W.2d at 753.  Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."  TEX. R. EVID. 403.  The relevant criteria for determining whether the prejudice of admitting the evidence substantially outweighs the probative value include, but are not limited to, the following: (1) the probative value of the evidence; (2) the potential the evidence has to impress the jury in an irrational but nevertheless indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence to prove a fact of consequence.  *Andrade v. State*, 246 S.W.3d 217, 228 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (citing *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005)).

We disagree that the trial court abused its discretion in restricting the scope of cross-examination and in failing to admit the Facebook photographs.  The trial court based its ruling on the fact that other evidence showing Y.G. had recanted on several occasions had already been admitted, and explained that the evidence of perjury with respect to the photographs would not add any more to impeach Y.G.  We agree that because the jury was already aware that Y.G. had lied, the excluded impeachment evidence was cumulative.  *See State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (explaining that the exclusion or admission of

evidence is harmless if the evidence was cumulative of other evidence). Accordingly, we overrule Yesenia's sixth and eighth issues as well as Alfonso's sixth issue.

### SEVERANCE AS TO ALFONSO

Finally, Alfonso contends the trial court erred in failing to sever his termination proceeding with respect to C.G., V.G., S.G., and D.G. from the termination proceeding against Yesenia with respect to all six children. Alfonso moved for a severance both before and during trial. On appeal, he argues that the trial court's failure to grant the severance prejudiced him because it forced the jury to consider Y.G.'s highly prejudicial accusations against him at the same time as the Department's grounds for termination of his parental rights as to his four natural born children.

Rule 41 of the Texas Rules of Civil Procedure provides that "[a]ny claim against a party may be severed and proceeded with separately." TEX. R. CIV. P. 41. This rule grants the trial court broad discretion in the matter of severance and consolidation of causes. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990). A trial court's decision regarding severance will not be reversed absent an abuse of discretion. *Id.* A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. *Id.*; *In re J.W.*, 113 S.W.3d 605, 611-12 (Tex. App.—Dallas 2003, pet. denied).

Here, the Department initiated proceedings to terminate the parental rights of both Alfonso and Yesenia as to all their children at the same time. The same facts and issues underlying the termination decision based on the physical abuse of Y.G. and E.G., the sexual abuse of Y.G., and the best interests of Y.G. and E.G., as well as the best interests of the four

younger children who lived in the same home environment, were closely interwoven. *See In re J.W.*, 113 S.W.3d at 612. Accordingly, we cannot conclude the trial court abused its discretion in refusing to sever Alfonso's termination proceeding from Yesenia's termination proceeding. *See id*. Alfonso's fifth issue is overruled.

## CONCLUSION

Based on the foregoing reasons, we overrule Yesenia's and Alfonso's issues on appeal and affirm the judgment of the trial court terminating their parental rights to their minor children.

Phylis J. Speedlin, Justice