

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-14-00131-CV

**IN THE INTEREST OF C.G.** Jr., a Child

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2012-PA-02761
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:    Marialyn Barnard, Justice
Concurring Opinion by:  Rebeca C. Martinez, Justice

Sitting:        Catherine Stone, Chief Justice
                Marialyn Barnard, Justice
                Rebeca C. Martinez, Justice

Delivered and Filed:  June 25, 2014

AFFIRMED

This is an appeal from a trial court's order terminating appellant C.G.'s ("Father") parental

rights to his child C.G. Jr.  In the order of termination, the trial court determined Father had violated

sections (O) and (P) of section 161.001(1) of the Texas Family Code.[1]  *See* TEX. FAM. CODE ANN.

§ 161.001(1)(O), (P) (West 2014).  The trial court further determined termination would be in the

best interests of the child pursuant to section 161.001(2).  *Id.* § 161.001(2).  On appeal, Father does

not challenge the trial court's findings relative to the grounds for termination, but contends the

---

[1] Section 161.001(1)(O) provides for termination of parental rights if the parent fails to comply with the provisions of a court order that established the actions necessary for the parent to obtain the return of the child.  TEX. FAM. CODE ANN. § 161.001(1)(O).  Section 161.001(1)(P) provides for termination of parental rights if the parent uses a controlled substance in a manner that endangered the health or safety of the child, and the parent (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completing a program, continued to use a controlled substance.  *Id.* § 161.001(1)(P).

evidence is legally and factually insufficient to support the trial court's determination that termination was in the child's best interests. We affirm the trial court's judgment.

### *Standard of Review*

Pursuant to the Texas Family Code, a court may terminate parental rights only upon proof by clear and convincing evidence that the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code ("the Code"), and that termination is in the best interest of the child. *Id.* § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re E.A.G.*, 373 S.W.3d 129, 140 (Tex. App.—San Antonio 2012, pet. denied). The Family Code defines clear and convincing evidence as "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *see J.O.A.*, 283 S.W.3d at 344; *E.A.G.*, 373 S.W.3d at 140. Courts use this heightened standard because when a parent's rights to his child are terminated, the result is permanent and unalterable changes for both parent and child, which implicate due process. *E.A.G.*, 373 S.W.3d at 140. Thus, in termination cases, the reviewing court must determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction that the grounds for termination were proven and that the termination was in the best interest of the child. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

In reviewing legal sufficiency of the evidence in termination cases, we view the evidence in the light most favorable to the trial court's finding and judgment. *Id.* Any disputed facts are resolved in favor of the lower court's finding, if a reasonable fact finder could have so resolved them. *Id.* All evidence that a reasonable fact finder could have disbelieved is disregarded, and we must consider undisputed evidence even if it is contrary to the trial court's finding. *Id.* In sum, we consider evidence favorable to termination if a reasonable fact finder could, and we disregard contrary evidence unless a reasonable fact finder could not. *Id.*

However, we may not weigh a witness's credibility, which depends on appearance and demeanor, as such issues are within the province of the fact finder. *Id.* at 573–74. Even when such issues are found in the appellate record, we must defer to the trier of fact's reasonable determinations. *Id.* at 573.

In a factual sufficiency review, we give due deference to the fact finder's findings and must abstain from substituting our judgment for that of the trier of fact. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction [in the truth of its finding], then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

### *Law on Best Interest*

There exists a strong presumption that maintaining the parent-child relationship is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, there is also a presumption that timely, permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West 2008). More than thirty years ago, the supreme court set forth factors for reviewing courts to consider when making and reviewing a best interest determination:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors, which are commonly referred to as "the *Holley* factors," are not all–encompassing and a court need not find evidence of each and every factor before it may terminate. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). In other words, an absence of evidence as to some of the *Holley* factors does not preclude a trier of fact from reasonably forming a strong conviction or belief that termination is in a child's best interest. *Id.* Moreover, although proof of acts or omissions under section 161.001(1) of the Texas Family Code does not relieve the Texas Department of Family and Protective Services ("the Department") from proving the best interests of the child, the same evidence may be probative of both issues. *Id.* at 28 (citing *Holley*, 544 S.W.2d at 370; *Wiley v. Spratlan*, 543 S.W.2d 349, 351 (Tex. 1976)).

## *Application*

The trial court held the termination hearing on January 30, 2014. Christian Markham, with the Department, testified that C.G. Jr., who is three-years-old, and his half-sister, who is nine-years-old, have resided with their maternal grandparents since December 2012. The children were placed with their grandparents several months after the Department received referrals alleging parental drug use and domestic violence. The Department attempted to work with the parents for over six months through "Family Based Services." However, the parents only complied with services during that time period "to some extent." Ultimately, court intervention was required, and the Department was awarded temporary managing conservatorship, and created a plan of service for the parents.

Markham testified Father completed "a few of the tasks" included in his service plan — his psychological evaluation, his "Midcoast" assessment, a parenting class, and an anger management class (substituted for the required domestic violence class). Father testified he took two parenting classes. However, Markham stated Father has not completed individual counselling or outpatient drug treatment. With regard to individual counseling, Markham was contacted by a Florida counselor at the end of December 2013. The counselor asked for certain documents so he could begin individual counseling with Father. Although Markham provided the counselor with the documents the same day, there has been no further contact with the counselor. Father testified he has completed counselling in Florida and has been "discharged," although he stated they "were going to continue treatment on other things."

With regard to child support, although he is employed, Markham stated Father failed to pay the court-ordered child support. Father testified he made some support payments, sending them by "Moneygram" as opposed to sending them to the child support office. Father claimed he did this because when he called the child support office, they had no record of his name. He said, "I do have a few Moneygrams I can recall."

As for Father's living arrangements, Markham considered his living arrangements in Florida and his job at a tattoo parlor to be stable. With regard to his residence, Father stated that if C.G. Jr. moved to Florida, everything is ready for him. He has an apartment and the child would have his own room. Father said he has a good job. However, Father testified that now he will have to "pack it all up and move it back to Texas and get another job and figure out how I can take care of my son."

Father stated he intends to move to Texas, but has "to finish one thing" — he has a pending misdemeanor theft charge with a court date of February 25, 2014. Father stated he would have moved back before, or had the child move to Florida, but there were issues because of the theft

warrant. Father advised that after he moves back, he intends to "get a job and try to see my son as much as I can."

Early on, Father would come to San Antonio approximately once a month and visit with C.G. Jr. However, there was a time period of three months when Father had no visits with the child, nor did he attempt to make contact with the grandparents during that time period. After the three months of no contact, Father resumed his once-a-month visits. Father stated he travelled to Texas every month to see his son, except that three month period. During that time, he had insufficient funds to make the trip. He explained he was short of money because he had to obtain a car and an apartment so he could care for his son. At that time he apparently believed the child would be permitted to move to Florida.

Markham opined that Father has not shown he has the ability to provide C.G. Jr. with a safe and stable home. She concluded that termination would be in the best interests of the child. She based her conclusion, in part, on the fact that in the two years the Department has been involved with the family, Father's visitation has been sporadic. Markham stated, "[h]e will be involved for a brief time a lot and then he won't be involved at all for a month or two. He'll have no contact with the people that are caring for his child or with me." Moreover, although he completed some portions of the plan of service, his drug use has continued and he has not completed a drug program. Father tested positive for marijuana in February, September, and October of 2013. Markham stated she was only able to order one drug test after October, at which time he tested negative, because he was in Florida. Father explained he smoked marijuana for pain relief after he broke his leg, before he was able to obtain a prescription for pain medication. He denies using drugs of any kind after October 2013. However, Markham testified she continues to have concerns about Father's drug use. Markham stated Father "just doesn't seem to be prioritizing his son in a way that allows him to care for his child adequately."

Markham testified C.G. Jr. has been with his maternal grandparents for over a year.[2]  C.G. Jr. attends a Head Start Program and is doing well.  The grandparents intend to adopt C.G. Jr. and his half-sister, allowing the siblings to stay together.

Father testified on his own behalf.  Beyond the testimony referred to above, Father stated he joined a church group and has been attending church regularly.  He also attends a "life group" associated with the church.  He said this group allows him to talk to people and express his feelings.

On cross-examination, Father admitted the grandparents were taking good care of C.G. Jr. and that C.G. Jr. has a strong bond with his half-sister.  He said he intends to allow C.G. Jr. to see his half-sister and wants them to have a close relationship, as he does with his own half-sister.  He does not believe that separating the children would be "devastating" because C.G. Jr. will be able to see her often.

Father admitted he does not yet have a job in Texas, but stated he has "a few prospects lined up."  He stated that although he does not know the outcome of the pending theft charge, it is a misdemeanor and his attorney has advised that he "will not do any jail time."  However, he does not know that for a fact, nor does he know whether he will be placed on probation, the terms of which could prevent his immediate return to Texas.

Father told the court his parents live in San Antonio and see C.G. Jr. as often as permitted, and their home would be a place he could stay until he found work and an apartment.

Father testified he loves his son and although he knows visitation is different from being a full-time father, he will have assistance from family and friends.  Father asked the court not to terminate his parental rights.

---

[2] The grandparents have cared for C.G. Jr.'s half-sister for most of her life.  She was formally placed with them in December 2012, at the same time C.G. Jr. was placed in their care.

Through his testimony, Father challenged, in part, the Department's allegations that he: (1) failed to comply with the court-ordered service plan, and (2) used a controlled substance in a manner that endangered the health or safety of C.G Jr. and failed to complete a court-ordered substance abuse program. *See* TEX. FAM. CODE ANN. § 161.001(1)(O), (P). As noted, Father testified he had completed counselling and had been discharged — albeit some of the counselling may have taken place before formal imposition of the service plan. Father apparently did not complete court-ordered drug treatment. However, Father testified he had not used drugs, other than those prescribed, since he smoked marijuana when he broke his leg. There was no evidence that when he was apparently using marijuana that he did so in a manner that endangered C.G. Jr.

It is clear Father's residential and job status in this state is uncertain. Father testified he has an apartment ready in Florida for C.G. Jr., but then states he is packed and ready to move to Texas. However, Father did not make any attempt to return to Texas during his involvement with the Department, choosing to remain in Florida. Admittedly he has no personal residence in Texas, but would rely upon his parents to provide a home for himself and the child until he is able to find work and save sufficient funds to find a place of his own. There was no specific evidence about the propriety of the home of Father's parents. Moreover, Father has no job here, merely ill-defined "prospects."

Importantly, it is undisputed that at the time of the hearing, Father had yet to appear in a Florida court with regard to an outstanding theft charge. Although Father testified his Florida attorney assured him he would not be incarcerated, that is uncertain. Moreover, even if not incarcerated, Father may be given conditions of probation that preclude his return to Texas for the foreseeable future.

There was also evidence, despite Father's denials, that he used drugs other than when he broke his leg. According to Markham, Father tested positive for drugs in February, September,

and October of 2013. Markham was unable to obtain additional testing because Father was in Florida.

The matter of resolving custody of C.G. Jr. has been pending for well over a year — the Department has been involved with the family for approximately two years. It is undisputed that C.G. Jr. is in a loving and stable home with his grandparents. In this home, C.G. Jr. has daily contact with his half-sister, with whom he has a close relationship. The grandparents intend to adopt the children and this would allow them to remain together.

After considering the evidence, the relevant *Holley* factors, and the applicable standards of review, we hold there is legally and factually sufficient evidence to support the trial court's determination that termination of Father's parental rights was in the best interests of C.G. Jr. We hold that under the clear and convincing standard, the evidence is such that the trial court could reasonably have formed a firm belief or conviction that termination was in the child's best interests. *See In re J.P.B.*, 180 S.W.3d at 573.

### *Conclusion*

Accordingly, based on the foregoing, we overrule Father's issues and affirm the trial court's judgment.

Marialyn Barnard, Justice