

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-14-00805-CV

**IN THE INTEREST OF M.C.**, M.C., M.C., M.C., and M.C., Children

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2012-PA-02868
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Marialyn Barnard, Justice
Luz Elena D. Chapa, Justice
Jason Pulliam, Justice

Delivered and Filed:  May 18, 2015

AFFIRMED

Appellant father ("Father") and appellant mother ("Mother") separately appeal the trial court's order terminating their parental rights to their five children. On appeal, neither parent challenges the sufficiency of the evidence to support the trial court's findings relating to the statutory grounds for termination. Rather, both contend the evidence is legally and factually insufficient to support the trial court's finding that termination was in the best interests of the children. We affirm the trial court's order of termination.

### BACKGROUND

The Texas Department of Family and Protective Services ("the Department") began its investigation in 2012 when one of the children belonging to Father and Mother tested positive at birth for cocaine and opiates. At the time of the child's birth, Father and Mother had three other

children.  Initially, the family was accepted into the Department's "Family Based Safety Services Program."  However, in December 2012, the Department filed an original petition, seeking temporary managing conservatorship of the children.  At the Department's request, the trial court rendered an order placing the children in the custody of the Department, and the Department placed the children in foster care.  Ultimately, the Department amended its original petition to include a fifth child who was born approximately nine months after the Department first began its investigation.  That child was also removed and placed in foster care.

Ultimately, a termination hearing was held over the course of five non-consecutive days, from April 15, 2014, to October 3, 2014.  After the hearing, the trial court ordered Father's and Mother's parental rights terminated, finding they: (1) knowingly placed or allowed their children to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed their children with someone who engaged in conduct that endangered their physical or emotional well-being; and (3) used a controlled substance in a manner that endangered the health or safety of their children and failed to complete a court-ordered substance abuse program or after completing it, continued to abuse a controlled substance.  *See* TEX. FAM. CODE ANN. §§ 161.001(1)(D)–(E), (P) (West 2014).  The trial court also found termination of Father's and Mother's parental rights would be in the best interests of the children. *See id.* § 161.001(2).  Thereafter, Father and Mother each perfected an appeal.

## ANALYSIS

On appeal, Father and Mother each raise a single issue, contending the evidence is legally and factually insufficient to support the trial court's finding that termination was in the best interests of the children.  *See id.*  As noted above, neither parent challenges the sufficiency of the evidence with regard to the trial court's findings under section 161.001(1).  *See id.* § 161.001(1).

***Standard of Review***

Under the Texas Family Code ("the Code"), a court has authority to terminate a parent's rights to a child only upon proof by clear and convincing evidence that the parent committed an act prohibited by section 161.001(1) of the Code, and that termination is in the best interest of the child. *Id.* § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re E.A.G.*, 373 S.W.3d 129, 140 (Tex. App.—San Antonio 2012, pet. denied). The Code defines "clear and convincing evidence" as "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008); *see J.O.A.*, 283 S.W.3d at 344; *E.A.G.*, 373 S.W.3d at 140. This heightened standard of review is required because termination of a parent's rights to a child implicates due process in that it results in permanent and unalterable changes for the parent and the child. *E.A.G.*, 373 S.W.3d at 140. Therefore, when reviewing a trial court's termination order, we must determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction that the grounds for termination were proven and that the termination was in the best interest of the child. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

With regard to legal sufficiency challenges in termination cases, we view the evidence in the light most favorable to the trial court's finding and judgment, and any disputed facts are resolved in favor of that court's findings, if a reasonable fact finder could have so resolved them. *Id.* We are required to disregard all evidence that a reasonable fact finder could have disbelieved, and we must consider undisputed evidence even if such evidence is contrary to the trial court's findings. *Id.* In summary, we consider evidence favorable to termination if a reasonable fact finder could, and we disregard contrary evidence unless a reasonable fact finder could not. *Id.*

We remain mindful that we may not weigh a witness's credibility because it depends on appearance and demeanor, and these are within the domain of the trier of fact. *Id.* Even when such issues are found in the appellate record, we must defer to the fact finder's reasonable resolutions. *Id.*

In a factual sufficiency review, we also give due deference to the trier of fact's findings, avoiding substituting our judgment for the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction [in the truth of its finding], then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266).

### *Best Interests*

Again, both Father and Mother challenge the trial court's finding that termination was in the best interests of their children. They argue the evidence is legally and factually insufficient to support the trial court's finding that termination was in the best interests of their children. We disagree.

### *Substantive Law*

Admittedly, courts must accept the strong presumption that maintaining the parent-child relationship is in a child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, we also presume that permanently placing a child in a safe place in a timely manner is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West 2014).

In determining whether a parent is willing and able to provide the child with a safe environment, the court should consider the factors set out in section 263.307(b), which include:

(1) the child's age and physical and mental vulnerabilities;
(2) the frequency and nature of out-of-home placements;
(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *see In re A.S.*, No. 04-14-00505-CV, 2014 WL 5839256, at *2 (Tex. App.—San Antonio Nov. 12, 2014, pet. denied) (mem. op.).

Although a best interest finding does not require proof of any particular, unique set of factors, *see In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied), courts may take into account the factors set forth by the Texas Supreme Court in *Holley v. Adams*: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976). These considerations, i.e., "the *Holley* factors," are neither all-encompassing nor does a court have to find evidence of each factor before terminating the parent-child relationship. *See In re C.H.*, 89

S.W.3d 17, 27 (Tex. 2002). Thus, lack of evidence as to some of the *Holley* factors does not preclude a trier of fact from reasonably forming a strong conviction or belief that termination is in a child's best interest. *Id.*

It is axiomatic that proof of acts or omissions under section 161.001(1) of the Texas Family Code does not relieve the Department from proving the best interest of the child. *Id.* at 28 (citing *Holley*, 544 S.W.2d at 370; *Wiley v. Spratlan*, 543 S.W.2d 349, 351 (Tex. 1976)). However, the same evidence may be probative of both issues. *Id.* Additionally, in conducting a best interest analysis, a court may consider circumstantial evidence, subjective factors, and the totality of the evidence, in addition to direct evidence. *A.S.*, 2014 WL 5839256, at *2 (citing *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied)). Lastly, a fact finder may judge a parent's future conduct by his or her past conduct in determining whether termination of the parent-child relationship is in the best interest of the child. *Id.*

There are five children involved in this matter. All five children share the same first and last initials. In order to refer to the children individually when necessary and to protect their identity, we shall refer to the children by the following pseudonyms and/or their ages at the time the trial began:

> (1) Joe — a nine-year-old boy, who turned ten during the course of the trial;
> (2) Jane — a five-year-old girl, who turned six during the course of the trial;
> (3) Sally — a three-year-old girl;
> (4) Becky — a one-year-old girl, who turned two during the course of the trial; and
> (5) John — a seven-month-old boy, who turned eight months during the course of the trial.

*See* TEX. FAM. CODE ANN. § 109.002(d); *In re E.A.T.*, 2015 WL 694929, at *1 (Tex. App.—San Antonio Feb. 18, 2015, no pet.) (mem. op.).

*The Evidence*

The Department called several witnesses to testify, including Mother, Kimberly Dyke — Mother's individual therapist, Father, and Amy Flores — the Department case worker. The attorney ad litem for the children called two witnesses: Ruben Chavez, a therapist providing family therapy to Mother and the two oldest children, Joe and Jane, and Avis Massey, the current foster mother for the children.

### 1. Mother

Mother began her testimony by admitting she was arrested April 1, 2014, two weeks before the termination hearing began, and she was not released for more than a week. She was arrested for theft — stealing from a friend's home. She also admitted that in March 2014, approximately a month before trial, she tested positive for cocaine on a hair follicle test. Mother admitted using cocaine "last year or two years ago" — she could not recall when — but denied using it in the months leading up to trial. She believed the hair follicle test was inaccurate, particularly given that she tested negative on several urinalysis tests in 2013.

Mother stated that when he was home, Father was the family "breadwinner." However, when he was "locked up" in 2012, she went to work in a bar — at that time she had three children and was pregnant with the fourth. She received help from her sisters. When Father was incarcerated, her life was more difficult because she had to work — each time he was arrested, she had to start a new job.

When asked, Mother admitted to the existence of domestic violence in the home. She testified the perpetrator was Father, with whom she had been living since 2002. Initially, she stated they married in 2007, but then said it was 2011. The couple had been living together since 2002. Mother stated they argued "a lot" and he was physically abusive "several times." Mother denied Father ever "hit" or "slapped" her; rather, he pushed her "towards the sofa." She specifically

denied that any violence took place other than verbal arguing and Father pushing her toward the sofa. Mother admitted the domestic violence took place in front of Joe, but denied Joe's claims that Father punched and slapped her. She advised that her domestic violence classes taught her that having the children in the midst of domestic violence is, in itself, domestic violence that injures the children.

Mother admitted she never called the police or reported the domestic violence, claiming she was afraid because Father threatened to take the children and send her back to Mexico. Mother stated she last spoke to Father approximately four months before trial, has not lived with him since November 2012, and she said he will not be returning to her house, where she has lived since February 2014. She stated whether she has the children or not, she does not plan "to go back with him." Father was incarcerated in a federal penal institution for a probation violation stemming from a prior drug offense. Despite the longevity of their relationship and Father's criminal record, Mother denied ever witnessing her husband use or sell drugs. She admitted Father was arrested for the probation violation in March 2013, during the pendency of the Department's investigation, but sometime before the second day of trial — May 23, 2014 — he was released.

Mother testified she learned from her domestic violence class that she needs to "keep away" from Father. Despite this testimony, she admitted she provided Father with a ride to the courthouse on the second day of trial. And, although she testified she no longer has a relationship with Father, they are still married. Mother stated they "have an agreement" that he will help her financially, but they will not live together. Father will live in "his own place" and "visit the children, and that's it." However, on the third day of trial, when asked about her "current situation with" Father, Mother specifically testified, "we are taking marriage counselling [sic] classes." She clarified, stating they started marriage counseling the day before the third day of the trial. She further

testified Father needs domestic violence classes "so he can be a better father, *a better husband*," suggesting she does not intend to remove Father from her life. (emphasis added)

As for the children, when asked — given her husband's incarceration, extensive criminal history and their violent history — whether she thought it would be in her children's best interests if Father's parental rights were terminated, she stated, "I cannot answer that." Although she does not believe the children should be returned to Father, she explained she did not "have the heart to take children away from someone." It appears Mother intends to permit Father to visit the children, despite the domestic violence issues and his prior incarceration for drug offenses. Mother clarified that she believes Father should get "psychological help" prior to any visitation with the children. She later stated that if therapy and counselling are unsuccessful, she will not "go back" with Father.

As to her service plan, Mother testified she finished her parenting classes, drug rehabilitation — although she tested positive for cocaine after completing rehabilitation, and her domestic violence classes. She stated her individual therapy is complete, but on-going. Mother admitted that in 2013, she discontinued her domestic violence classes — with one class remaining — and her individual therapy, but Mother said this was because she was eight-months pregnant and could not walk. Moreover, she was told she could complete services after giving birth.

Mother testified she is working two jobs for a total of twenty-five hours per week. She stated she has been cleaning houses — before her last pregnancy and now since November 2013 — and working at a restaurant — since December 2013 or January 2014. Mother stated the only time she failed to work during the course of the case was a period of time during her last pregnancy. Mother stated she has provided the Department with proof of employment. Mother also testified she is renting a two-bedroom, two-bath house, which she moved into at the end of February 2014, approximately six weeks before the termination hearing began. Mother stated she provided this information to the Department and a Department representative came to the house before she

moved in. At the time of the Department visit, Mother had no water in the house and no stove, but Mother stated the Department never returned after she moved in. Mother provided pictures of the house, which were admitted into evidence. Mother initially admitted that she has been evicted twice in the past, but later stated it was only once.

Mother downplayed Joe's concerns about loss of electricity and other services, stating their electricity and water was "cut off" one time in 2012 for a week. The utilities were cut off, according to Mother, because Father was not working and she got behind on the bills. However, Father began working and they were able to have service restored within a week. Mother testified that during the week the utilities were off, the family stayed at her sister's home. She later testified they stayed with Father's mother. She also denied stealing in front of Joe, testifying she could not understand where he got that idea from. Mother also denied using drugs in front of Joe and claimed she did not know why he worries about drug use. Mother admitted she was unaware Joe claimed he was molested while in the care of one of her sisters, or that he was currently in therapy for sexual abuse. She was also unaware that when he was taken into Department custody, Joe was in pain as a result of numerous cavities. Mother testified she took Joe to the dentist, but could not remember when.

Mother testified she has made numerous attempts to contact Ms. Flores — her Department case worker — sending numerous text messages since the end of April 2014, regarding her desire to see the children, but her messages went unanswered. Ms. Flores denied this, testifying that Mother's efforts to stay in contact with her through the duration of the case have been inconsistent. Ms. Flores also testified that if she received a voicemail from Mother, she called her back. Ms. Flores denied blocking Mother's calls. Additionally, Mother's individual therapist subsequently testified that in their sessions, Mother was advised that if she could not reach her case worker, she could contact the supervisor. Moreover, Mother admitted that during the course of the case, her

case worker and the foster mother were accommodating with regard to Mother's requests to see the children at different locations, and prior to her incarceration, Mother was in contact with the foster mother. It was only after Mother's latest incarceration that visitation and contact apparently stopped. However, during the trial, visitation resumed and Mother saw four of the five children each time. Mother stated the visits went well, but there should have been more visitation permitted. Mother testified she was unable to secure additional visits because she could not reach Ms. Flores.

Mother concluded her testimony by stating the children should stay with her. She testified she has family members who can help her with the children — specifically, her mother and her sisters. Mother stated her mother is living with her and can assist in taking care of the children. When asked where the children should be placed should the court determine her rights should be terminated, Mother first testified she would like the children to be placed with one of her sisters, but she later testified she would like them to be placed with her mother.

### 2. *Kimberly Dyke – Mother's Individual Therapist*

After Mother's testimony, the Department called Kimberly Dyke, Mother's individual therapist, to the stand. Mother had testified she participated in individual therapy with Ms. Dyke beginning two weeks after John — her youngest child — was born. Mother testified the therapy sessions were helpful, allowing her to recognize "many things — in which I was wrong." Ms. Dyke, a licensed professional counselor, agreed she began seeing Mother sometime in October 2013. Ms. Dyke stated Mother "was very consistent" with regard to attending therapy until March 2014. After that, Mother attended two more sessions, then canceled the next two. Mother rescheduled one of the sessions, but failed to show. Ms. Dyke was told by Ms. Flores that Mother failed to appear because she was in jail on the theft charge. Since Mother's release, she has not contacted Ms. Dyke. According to Ms. Dyke, as of the date of her testimony, she would have to say that in her professional opinion, Mother was unsuccessful in therapy.

During her testimony, Ms. Dyke stated she prepared a "termination summary," which was provided to the Department. The summary was admitted into evidence without objection. According to Ms. Dyke, the summary showed Mother was late for therapy or cancelled sessions four times. The last session they had was March 10, 2014 — a little over a month before the termination hearing began. Thereafter, Mother cancelled the next two sessions — once for work and once for illness. Mother rescheduled a session for April 1, 2014, but that is the day she was arrested and incarcerated. Mother did not reschedule or schedule any sessions after her release from jail. Accordingly, Ms. Dyke, in the summary, stated Mother's therapy was terminated because she refused to receive or participate in services.

As for therapeutic goals, Ms. Dyke included in her summary that Mother had "no change" with regard to the goal of "improved safety and security planning parent/child." Ms. Dyke testified that although Mother had some initial ideas about how to keep the children safe, her failure to continue therapy indicated the ideas were not being implemented. Ms. Dyke advised there was a "slight" improvement with regard to the goal of establishing a stable living environment because Mother rented a house, but Mother did not receive a score higher than "slight" because although she obtained a house, she had not demonstrated her ability to maintain the house for a significant period of time. Ms. Dyke also testified it gave her quite a bit of concern regarding the stability of housing given Mother's prior evictions. She stated instability is hard on the children. Mother also received a "slight" score with regard to improvement in problem solving skills. Although Mother had begun to find ways of working through issues that kept her from being successful in the past, Mother had not demonstrated a continued pattern of problem solving. Moreover, Mother's contact with Father since his release from prison was a cause of concern to Ms. Dyke. Specifically, she stated that because of their previous relationship, continuing contact, coupled with potential stress, could result in a resumption of their relationship. Also, it was not until their last two sessions that

Mother really began to open up vis-à-vis the domestic violence issue, and this was only after Joe confronted her in family therapy. As a result, Ms. Dyke graded Mother's improvement as to the goal of distinguishing between health and unhealthy relationships as "slight." Ms. Dyke expressed concern that during her testimony, Mother focused on the fact that the domestic violence was directed only at her — seeming to forget that this also constitutes domestic violence as to the children. In fact, Ms. Dyke opined this testimony might cause her to change her prior "slight" improvement grade to "no change," opining that it seems Mother does not completely understand how injurious her violent relationship with Father was to the children. As for Mother's drug use, Ms. Dyke testified Mother made "moderate" improvement in identifying triggers for drug use.

Ms. Dyke agreed that "slight change" or "moderate change" with regard to therapy goals was, in her opinion, insufficient to permit Mother to regain custody of her children. She stated Mother needs to establish ongoing improvement, which she did not do given her apparent abandonment of therapy in early March. According to Ms. Dyke, if Mother had continued her therapy, there might have been more improvement, but her discontinuation of the sessions is "a cause for concern," and Mother seems to have actually declined since she stopped attending therapy. Ms. Dyke testified she believed the children had waited long enough for Mother to change her behavior, and that if the children were returned to Mother she would "be very concerned" for their safety. Ms. Dyke explained Mother's relationship with her children "still needs a lot of work," and that if she continues to pursue contact with Father, the children will be aware of it, which may cause "trepidation" for Joe.

### 3. *Father*

Father began his testimony by admitting he had been incarcerated and was released April 23, 2014 — during the trial — but was required to spend thirty days at a halfway house. He explained his recent incarceration was not because he "caught a new charge," but because he had

failed to report to his parole officer as required — this was his second violation for failure to report. Father was quickly released after his first violation, but his second violation resulted in more than a year of incarceration. He claimed he failed to report to his parole officer the second time "because I was working in the oilfield as a truck driver and my probation officer didn't like the fact that I was out, so I just wasn't compliant and I stayed working and I was violated."

Father testified the parole violations stemmed from a 2003 conviction for conspiracy to distribute five kilograms of cocaine. Father served fifty months — four years and two months — in a federal prison and was released on parole in 2007. Father was placed on parole for five years. One condition of his parole was that he report to his parole officer. When he failed to report the first time, his parole was revoked but he was quickly released. However, when he failed to report a second time, his parole was again revoked and he was returned to prison for eighteen months. Father admitted he was given the option of release after fifteen months, but declined because early release would have meant another five years on parole. Father decided to stay in prison for the entire eighteen months, at which time he would be released without restriction. He also admitted he had previously been charged with robbery, but the charge was dismissed because the complainant passed away while Father was in prison on the federal drug charge.

As for living arrangements, Father advised that although he uses his mother's address, he "practically live[s] in [his] 18-wheeler." He currently has no place for the children to reside if he were to retain custody, but testified it would not take him long to obtain a place because he is making "almost $2,000 a week," working for a company that hauls "frac sand" for another company with oils rigs throughout the United States. His job is to deliver "frac sand" to well sites in south and west Texas, New Mexico, Oklahoma, and Louisiana. However, he stated he is "mostly regional" — south and west Texas and New Mexico. Father said he has already spoken to a realtor about getting a home. Father testified he works seven days a week, fifteen hours a day

for twenty-one days and then he is off for three days. On those three days, he sometimes stays with his mother, but he said he often rents a hotel room instead because his mother's home is in an area where the "drug and crime rate is very high."

Regarding the family's past living arrangements, Father stated that when he was on parole, he and Mother lived with their three oldest children. The fourth child, Becky — the one who tested positive for narcotics at birth — was born after Father was returned to prison for a parole violation. Father testified he never saw Mother use drugs, but admitted he was aware she used them and knew Becky was born with drugs in her system. When asked if he tried to stop Mother from using drugs, Father stated he tried to make their living situation less stressful by working and providing for the family. Father claimed that many of Mother's problems were his fault because he was incarcerated, but he acknowledged his decisions did not cause Mother to use drugs. He also admitted Mother's drug usage endangered the children and they have suffered as a result of his and Mother's behavior. Father also admitted there is a pattern of instability with Mother when he is not around — e.g., drug use, eviction — and yet he made a conscious decision to violate his parole, knowing the children would be left alone with Mother.

Father was questioned about the allegations of domestic violence. Father specifically stated he "never put" his hands on Mother. He admitted there were "loud" verbal arguments in front of the children and foul language was used. Father described his behavior toward Mother as being "aggressive . . . with my voice." He recognized this constitutes abuse, but continued to deny ever being physically abusive with Mother, pointing out he was never "charged for hitting her or punching her." Father testified Mother told him he could not come home "unless I go to marriage counselling and unless the kids feel comfortable around me and that I'm showing effort that I'm a better person than what I was." Father said he still loves Mother and they are "very devoted to

each other." Father admitted Mother picked him up when he was released from prison, and that they had lunch during a court recess.

As for the Department service plan, Father admitted he received it, but he did not complete the plan and did not attempt to "work services" even after he was released, other than obtaining employment in an attempt to establish stability. Father complained that Ms. Flores did not assist him in setting up counseling, etc. when he was released, but acknowledged the service plan included addresses and telephone numbers related to the required services. Father admitted he never called the telephone numbers provided on the service plan and has not attempted to begin services. Although he did not complete services, Father testified that while in prison, he took the initiative and completed a three-month parenting class, a drug class, and an anger management class. The completion of the classes entitled him to "good time" credit, reducing his prison time.

Father testified that since his release in April 2014, he has seen the children twice. Like Mother, he stated he has had difficulty arranging visits because he is unable to reach Ms. Flores by telephone. However, as noted above, Father works twenty-one days straight, making it impossible for him to see the children during that period, and with only three days off, scheduling visitation is problematic. When he was able to see the children after his release, Joe, the oldest child, did not want to see him. Father testified he was told by Ms. Flores that Joe is "terrified . . . and scared" of Father, but Father did not believe this because each time Joe ran to him and hugged him, telling him he loved him. However, Father admitted that after the brief interaction, Joe ran back to his foster mother and they left. Ms. Flores also told him Jane, his oldest daughter, is also terrified of him, but like Joe, she also hugged and kissed him during the visits.

Father testified he does not believe they deserve to lose their children. Father admitted that neither he nor Mother used good judgment in the past, but he changed "the day [he] was released" from prison. He believes he can complete the required services on his days off, but he feels they

need a case worker who is actually working with him and Mother toward reunification. Although he admitted that while he was incarcerated Ms. Flores wrote to him, providing him with progress reports on the children, it is his belief that Ms. Flores decided he is "not a good person" and is "against" him. He does not believe he has a relationship with Ms. Flores whereby they are working toward the same goal.

### 4. *Avis Massey — Foster Mother*

The attorney ad litem for the children called Avis Massey, the children's current foster mother, as a witness. Ms. Massey testified that initially, the children were placed with Father's relatives. However, the four older children came into her care on December 27, 2012, and the baby was placed in her care after his birth in September 2013. Ms. Massey stated that when the four older children arrived, "they were all very sick." She said the three girls had the flu and ear infections. Joe was also sick, but not as sick as his sisters. Ms. Massey said "we spent December 31st in the hospital." All of the children are fine now, but they suffer from allergies and use breathing machines. Sally, the three-year-old "continues to get touches of pneumonia because of RSV." Ms. Massey described Sally's condition as "pretty serious." She also provided testimony about Joe's dental issues, stating he had numerous cavities when she took him to the dentist. After, Joe thanked her for months for taking him to the dentist, telling her he "had been complaining for a while about his teeth hurting but his mom I guess she would put something on it or just kind of not really take care of it."

Ms. Massey testified she has been in contact with Mother from the time the children were initially placed with her in an attempt to foster reunification. Ms. Massey stated that initially she did not intend to retain custody of the children or adopt them. However, that has now changed.

As for Joe, Ms. Massey advised that he tries to parent the other children and she has to constantly redirect him. Joe feels he has to take care of his younger siblings, telling Ms. Massey

that in the past he cooked for them, changed diapers, etc. Ms. Massey told Joe, who was eight-years-old when he came to stay with her, he did not need to do those things, she was "the mom," and she would take care of it. Ms. Massey testified that according to Joe, once he opened up to her, he said "his dad . . . was the mom. His dad was the one that really cared for him, and that the mom would just kind of sit back and let the dad cook for the kids and do everything for the kids." Once Joe opened up, "he shared a lot." One example he shared was that he was accused of taking some money, but Mother knew he did not take the money because she took it. Joe felt Mother failed to protect him and this upset him. He also witnessed Mother stealing shoes from a store. Joe told her he knew Mother was recently arrested for theft, and he was glad she "got caught" because she might "learn her lesson." Joe also told Ms. Massey about alleged sexual abuse by an older male cousin while he was in his aunt's home. According to Joe, he told his mother, but she did not believe him "until [he] started bleeding." Ms. Massey asked if Mother took him to the doctor or took any other action, and he said "no." Ms. Massey relayed this information to Joe's therapist.

When Joe first arrived, he missed his mother, but he missed his "Auntie Vella" more because it was her home in which he stayed. Although Joe does not want to hurt Mother's feelings, he really does not desire to be reunified with her or Father. Joe told Ms. Massey he does not feel safe with Father because of things that happened in the past. Joe also divulged that it was really only once they were placed in Ms. Massey's home that he lived with his sisters. According to Ms. Massey, Joe led her to believe that when he was born, he went to stay with his grandmother in Mexico, as did his sister Jane. When he was three or four, he returned to San Antonio, but lived with his "Auntie Vella." Mother denied that any of the children stayed with any of her sisters for more than two or three hours at a time — she specifically stated, "I have never left them with them." Admittedly, Joe told stories in which it appeared the four children were together in a home

with Mother and Father, but the stories from those periods were disturbing, e.g., Father killed a rat, "the lights got turned off." Mother admitted she sent Joe to stay with her mother for a month "when he was smaller," but denied sending either Joe or Jane to live in Mexico, claiming she only sent them with their father to visit her mother for two weeks.

Ms. Massey told the court the children enjoyed their visits with Mother, but they also enjoy returning to her house. Initially, at least one of the children — three-year-old Sally — would cry when she had to leave after a visit with Mother, but now none of the children cry when they return home after visiting Mother. Ms. Massey stated the children are doing well in her home and that if the parents' rights are terminated, she will keep all of them permanently.

### 5. *Ruben Chavez — Family Therapist*

The attorney ad litem for the children also called Ruben Chavez, a family therapist, as a witness. Mr. Chavez testified he has been seeing Mother and her two oldest children, Joe and Jane, two to three times a month for a little over a year. Father has not participated in family therapy and Mr. Chavez never met him.

According to Mr. Chavez, from the outset, Joe, who is "pretty mature" and "pretty intelligent" for his age, "has had a lot of anxiety about returning back into that environment where he was removed from." Joe desires stability and is "fearful" that if he is returned home, there will be a lack of food in the house, no electricity, or he will be exposed to rodents and insect infestations. Joe also has concerns about the domestic violence he witnessed in the home. Mother admitted that during therapy, Joe told her he does not want her to resume her relationship with Father; Mother testified she told him she would not resume her relationship with Father. Mr. Chavez testified Joe is not only concerned for himself, but as the oldest, he is concerned for his four younger siblings. In fact, Mr. Chavez opined that Joe, at the age of nine, has become "parentified," taking on the role of parent with his siblings. Joe worries and is constantly fearful

that Mother will continue to engage in bad behavior, e.g., drug use and theft. Joe expressed anger that his Mother exposed one of his siblings — at birth — to drugs. Mr. Chavez believed Joe's inability to protect his siblings caused Joe great distress. However, since he was removed, Joe has shown progress, beginning to let go of his need to parent his siblings.

As for Joe's concern about Mother stealing, it stems from Joe's knowledge — as previously described by his foster mother — that Mother was recently arrested "again" and charged with theft. Joe told Mr. Chavez about prior incidents of theft involving Mother. Mr. Chavez stated the arrest initially surprised Joe, and he expressed sadness and hope that Mother would learn her lesson and change — much as he told Ms. Massey.

Mr. Chavez also treated five-year-old Jane. He testified Mother's drug use had a "very negative effect" on Jane. If Mother's behavior continues and Jane is returned, it will "set her up for problems far into the future." Like Joe, Jane told Mr. Chavez about her memories of domestic violence in the home.

Mr. Chavez also believed Mother failed to make significant progress in changing her behavior given that she continues to engage in behaviors — drug use and theft — that cause her two oldest children to worry and feel insecure. However, Mr. Chavez admitted Mother was able to see the effect of her behavior on her children, which was a breakthrough for her. Despite this, Mr. Chavez indicated concern, noting Mother missed some therapy sessions — the last one because she was arrested and incarcerated. And, although Joe has been able to confront Mother during therapy, resulting in some "positive moments" in which she validated his memories and fears, given her continued pattern of behavior, Joe has been unable to make any "real measurable progress" in family therapy as it relates to his mother.

Despite some progress with his mother during therapy, Mr. Chavez testified that since he was removed from his home, Joe has adjusted well to his new home and school. Although Joe and

Jane enjoy visits with their mother and would be "sad" if they never saw her again, Joe feels secure in his foster home and believes it is a good placement for himself and his siblings. The foster home is stable and has helped the children in the therapeutic process. Mr. Chavez testified the children have been waiting long enough for their Mother to change and it would be in their best interests to have stability in their lives, which the foster home provides. According to Mr. Chavez, if Mother's behavior is affecting the two oldest children, it is likely affecting all of them. Thus, Mr. Chavez concluded that given the current environment in the home, returning the children would not be beneficial to the children. To the contrary, it would be in their best interests to stay with their foster family and, if possible, be adopted by the family.

### 6. *Amy Flores — Department Case Worker*

Ms. Flores began her testimony on the fourth day of trial, August 20, 2014. She testified she has been the case worker in this matter since its inception except for two or three months. She talked about the parents' ability to work their service plans. As to Father, she testified he had the ability to work services when the case was still in the "Family Based Safety Services Program," which lasted approximately three months. Then, when the case was officially opened in December 2012, Father "was available to do services at that point." Admittedly, after he was incarcerated, his ability to complete any portion of the service plan was limited, but he attempted to undertake classes in prison one of which might give him credit, e.g., a parenting class. Once Father was released in May 2014, he again had the ability to work on his service plan. However, since his release in May of 2014, Father had not started or completed: (1) a psychosocial evaluation; (2) domestic violence classes; (3) anger management classes, (4) individual therapy; or (5) a drug assessment. Ms. Flores testified it was Father's burden to contact the service providers using the information provided in his service plan. When asked if she was aware that Father and Mother "are taking family therapy," Ms. Flores stated Father provided her with information about therapy

at Our Lady of the Lake University. However, when Ms. Flores contacted the university, she was told that although the parents went for an initial consultation in July, no future appointments had been scheduled. Ms. Flores was not aware of the parents' attendance at any other therapy sessions.

Ms. Flores opined that because of his incarceration due to the parole violation, Father could not have shown significant progress as to services or demonstrated he learned from the services so as to establish he is no longer a safety risk with regard to his children. Moreover, given the employment Father allegedly accepted upon his release — a truck driver working twenty-four hours a day for twenty-one days straight — it would be impossible for Father to work and complete the required services, or for Ms. Flores to interact with Father in such a way that she might determine he benefitted from the required services. To properly work the service plan, Father would have to be available every week, e.g., domestic violence classes are required once a week for sixteen weeks. Father "indicated" to Ms. Flores that his schedule changes and he does not always know when he will be available — he might be available for one week, but he is not sure when that might be.

Ms. Flores also provided testimony that Father had failed to provide child support as required by the plan of service. Specifically, Father had not paid any child support since his release, despite his claim that he is earning $2,000 a week. Ms. Flores did note that although Father claims he is working, he never provided proof of employment. As for drug use, Father tested negative on a urinalysis exam in May 2014, after he left the halfway house. However, he tested positive for cocaine on August 21, 2014 — during trial — on a hair follicle test. Ms. Flores testified that when she talked to Father about the positive test, he denied using drugs and claimed Ms. Flores tampered with the test. Father attempted to counter Ms. Flores's testimony on the recent drug test, stating as part of his employment he is regularly drug tested and given that he is still employed, the tests must have been clean. Father testified he has been drug-free since his

release from prison, stating he took another hair follicle test at his own expense and believes the results will be negative.

As for visitation, Ms. Flores testified that when Father advised her he would be available during a certain week, she set up visitation with all of the children. Since his release, Father visited with some of the children once each month for an hour — June, July and August. To her knowledge, Father did not visit the children after they were removed but prior to his reincarceration. Ms. Flores stated she would advise the two older children — the ones who are verbal — when they were to visit with Father or Mother. Initially neither Joe nor Jane wanted to see Father because they were scared. However, Jane is no longer scared and Father's visits with her and the other children have been positive.

Ms. Flores said she made particular efforts with the oldest child, Joe, with regard to visitation, but he "stated over and over he does not want to see his dad." Joe told her he is "confused . . . afraid and does not want to see his father." Joe said he was scared because seeing his father causes him to remember things that went on in the household. Joe told her that many times he saw his father hit or slap his mother, push her, and pull her hair. He also saw his mother throw coffee at Father during an argument. According to Ms. Flores, Joe has a "vivid memory of the domestic violence." Joe believes father "is lying to him right now. He thinks that his dad is putting up a front." He also thinks his mother is lying to him. Joes says he "has a weird feeling inside his stomach."

Ms. Flores stated she has picked Joe up from daycare to try to talk him into visiting with Father, and Joe has even come to the Department for a visit, but changed his mind at the last minute. Joe also refused visitation with Mother. Ms. Flores admitted that during one visitation, after Father spent time with Joe's siblings, Father and Joe embraced. After this incident, Ms. Flores took Joe to her supervisor to see if she could convince Joe to visit with Father, but Joe

continued to insist he did not want to visit with him. Others also attempted to persuade Joe to meet with his Father, including his therapist and his foster mother, but without success. After speaking with Joe's therapist, the Department decided it was not in Joe's best interest to force him to visit with Father.

Despite Joe's insistence, after the third day of termination hearing — at which Father testified Joe hugged and kissed him and told him he loved him before running back to the foster mother — Ms. Flores spoke to Joe's therapist about a possible "therapeutic visit" between Father and son. Mr. Chavez — the therapist — advised her it would not be a good idea because: (1) the goal is no longer reunification; and (2) it would be a setback for Joe.

Ms. Flores said there were also concerns with Mother's visitations with Joe. Specifically, during a recent visit, Joe's maternal grandmother came with Mother. Joe told Ms. Flores and his foster mother that he heard Mother say in Spanish to her mother "that she couldn't handle the kids and to take them because they weren't listening to her." This upset Joe and since then, he had been "adamant about not seeing his mom." This also reinforced a concern Ms. Flores already held about Mother's ability to manage all five children.

According to Ms. Flores, the Department has provided Mother with "all the services . . . that would help her" learn to manage the children, including a parenting class. Yet, Mother is still unable to manage all the children at once. Mother has not demonstrated that she learned anything from her service plan that would aid her in raising her children on her own. As for Mother's bond with her children, it is much stronger with the three older children because the younger two have never been in her care. Prior to the last four months, Mother was inconsistent with regard to visitation, exacerbating the distance between herself and her two youngest children. When Mother missed visitation, her excuses included illness, missing the bus, and incarceration.

As for Mother's service plan, although she completed numerous classes, she failed to complete individual therapy, and was discharged for "excessive no shows." Moreover, even though she attended and completed several classes, Mother failed to meet certain goals set out in the service plan. According to Ms. Flores, it is not sufficient simply to complete services, one must reach the goals set out in the service plan — the actual services are there to assist the parent in attaining the goals. For example, after initially being discharged as unsuccessful due to "excessive no shows," Mother completed her domestic violence classes and received a certificate. However, Ms. Flores testified Mother has "not done anything to demonstrate that she's learned from the domestic violence class[es]." Mother's testimony establishes she intends to continue her relationship with Father, despite the prior domestic abuse. According to Ms. Flores, she has seen Mother with Father at stores and has seen recent Facebook pictures of them at a club. Ms. Flores concluded the couple is still involved, despite a history of domestic violence and Mother's completion of the domestic violence program.

Mother's plan of service also required that she complete a drug assessment, which she did. After the assessment, it was recommended that Mother complete outpatient drug treatment, which she did. Despite this, in February 2014, Mother tested positive for cocaine — it was Mother's cocaine use that brought the Department in initially when Mother gave birth to Becky, who tested positive for cocaine and opiates. Ms. Flores testified the February test was a hair follicle test and picks up prior drug use up to three months. Ms. Flores stated she has required that Mother be drug tested and admitted Mother has taken a couple of urinalysis tests that were negative. However, she attempted to swab Mother's mouth during a visitation, but Mother refused, stating she had to go to work. Ms. Flores asked Mother "to take several others, in particular in June and in July" of 2014 "and she no showed." Mother failed to show up for her July 11, 2014 drug test, instead showing up on July 16, perhaps to allow any drugs to leave her system. Ms. Flores opined this

causes concern with regard to Mother's sobriety. Then, in August, while the trial was ongoing, Mother was asked to submit to another hair follicle exam. The exam took place on August 21, 2014 — the same day as Father's exam — and like Father, Mother tested positive for cocaine. Mother tested positive again on September 28, 2014 — during the last week of the termination hearing. On that same day, Mother was rearrested on the April theft charge. Ms. Flores reminded the court that Father was imprisoned on a drug charge involving distribution of cocaine, the Department entered this case because Becky tested positive at birth for cocaine, and now, during trial, both parents — who have continued their relationship — tested positive for cocaine.

Admittedly, Mother leased a home, but Ms. Flores was concerned because when she visited at a time designated by Mother — February 2014 — the home had no water, electricity, or furniture. Mother explained that technically she was not moving in until the end of the month — shortly before the termination hearing was set to begin. Mother previously had issues with her water and electrical services being cut off for non-payment. She was also evicted from another residence. Ms. Flores testified she returned to the home a few weeks later and left her card on the door, but Mother did not call her.

Although Mother testified she has employment cleaning houses and waitressing, Ms. Flores has concerns. First, Mother provided her with a telephone number for a woman whose house she cleans. When Ms. Flores spoke to the woman, she stated Mother cleans the house "every now and then." Second, Ms. Flores contacted the restaurant in July 2014 and was told Mother had not been working there. Thus, Mother failed to provide proof of employment.

In sum, Ms. Flores testified that although Mother completed the actual services — but for the individual therapy — she did not meet a single goal set out in the plan of service. Specifically, she has failed to put her children's needs before her own, maintain a sober lifestyle, demonstrate she has a safe and stable home, or put the safety of the children above her needs. Additionally,

she has not established proof of employment so that she can support the children in the event they are returned to her.

Ms. Flores also provided testimony about the foster placement. She stated she has observed the foster mother, Avis Massey, with the children and Ms. Massey had demonstrated an ability to manage the children. Ms. Flores opined the children are in a good placement and Ms. Massey provides them with "the best possible future." Mother did provide the names of relatives that might be willing to take the children in the event of termination, but when Ms. Flores tried to contact them, they never returned her calls.

Ms. Flores recommended both parents' rights be terminated, pointing out that the children have been in foster care for almost two years — except of course for John, who was born in 2013. She testified the drug issues that brought the children under the auspices of the Department still exist. Both parents have recently tested positive for cocaine, a pattern of behavior going back to Father's initial arrest in 2003 on drug charges, as well as the birth of Becky in 2012. In addition, Mother continues her relationship with Father despite completion of domestic violence classes, perpetuating the prior cycle of abuse. Thus, it would be in the best interests of the children to terminate both Father's and Mother's parental rights.

### *Application*

Admittedly, there is some evidence that Father and Mother made efforts toward resolving their issues. *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11) (willingness and ability of family to seek out, accept, and complete counseling services; willingness of child's family to effect positive personal changes within reasonable time); *Holley*, 544 S.W.2d at 371–72. Mother attended and completed parenting classes, domestic violence classes, and drug rehabilitation. *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11); *Holley*, 544 S.W.2d at 371–72. She also participated in individual and family therapy. *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11);

*Holley*, 544 S.W.2d at 371–72. Father seemingly obtained a well-paying job and may have begun a marriage or family counseling program with Mother. *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11); *Holley*, 544 S.W.2d at 371–72. In their testimony, both parents manifested a desire to change in order to reunify with their children, expressing deep love and concern for them. *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11). Despite this, we hold there is sufficient evidence that would have allowed the trial court to have reasonably formed a firm belief or conviction that termination was in the best interests of the children. *See J.P.B.*, 180 S.W.3d at 573.

Neither parent challenged the grounds for termination, and there is evidence both parents committed acts or omissions under section 161.001(1). *See C.H.*, 89 S.W.3d at 28. More specifically, there is evidence Father and Mother: (1) knowingly placed or allowed their children to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed their children with someone who engaged in conduct that endangered their physical or emotional well-being; and (3) used a controlled substance in a manner that endangered the health or safety of their children and failed to complete a court-ordered substance abuse program or after completing it, continued to abuse a controlled substance. *See* TEX. FAM. CODE ANN. §§ 161.001(1)(D)–(E), (P). Although proof of acts or omissions under section 161.001(1) is not dispositive in a best interest analysis, it is certainly probative. *See C.H.*, 89 S.W.3d at 28 (citing *Holley*, 544 S.W.2d at 370; *Wiley*, 543 S.W.2d at 351).

In addition, Father and Mother have a history with illegal narcotics. *See* TEX. FAM. CODE ANN. § 263.307(b)(8) (history of drug abuse by child's family); *Holley*, 544 S.W.2d at 371–72; *see also A.S.*, 2014 WL 5839256, at *2 (holding that trier of fact may judge parent's future conduct by past conduct in determining whether termination is in child's best interest). It is undisputed Father was incarcerated for almost five years for conspiring to distribute five kilograms of cocaine. *See* TEX. FAM. CODE ANN. § 263.307(b)(8); *Holley*, 544 S.W.2d at 371–72; *see also A.S.*, 2014

WL 5839256, at *2. When released on parole, he twice violated his conditions of parole, resulting each time in reincarceration. *See Holley*, 544 S.W.2d at 371–72. When Mother gave birth to her fourth child in 2012, the child tested positive for cocaine and opiates, ultimately resulting in the Department removing the children. *See* TEX. FAM. CODE ANN. § 263.307(b)(8); *Holley*, 544 S.W.2d at 371–72; *see also A.S.*, 2014 WL 5839256, at *2. Moreover, during the course of the Department's case, both Father and Mother submitted to hair follicle exams and each tested positive for cocaine. *See* TEX. FAM. CODE ANN. § 263.307(b)(8); *Holley*, 544 S.W.2d at 371–72. In fact, during the course of the termination hearing, which took place over a course of months, both parents tested positive for cocaine — although they denied using drugs; Father going so far as to accuse the case worker of tampering with the results. *See* TEX. FAM. CODE ANN. § 263.307(b)(8); *Holley*, 544 S.W.2d at 371–72. The last positive test for both parents was in August 2014, almost two years after the Department's initial intervention. *See* TEX. FAM. CODE ANN. § 263.307(b)(8); *Holley*, 544 S.W.2d at 371–72.

There was also evidence showing that although Mother completed domestic violence classes, she failed to apply that knowledge to her situation. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (11), (12) (history of abusive or assaultive conduct by child's family; willingness to effect positive changes within reasonable time; demonstration of adequate parenting skills); *Holley*, 544 S.W.2d at 371–72. Despite testifying that she learned she needs to stay away from Father, other evidence showed Mother and Father resumed their relationship — except for actual cohabitation — immediately after Father left the halfway house and before he took any domestic violence or therapy classes. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (11), (12); *Holley*, 544 S.W.2d at 371–72. Moreover, despite her oldest child's claims that Father physically abused Mother and his fears relating to the abuse, both Mother and Father denied any physical violence or downplayed it. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (11), (12); *Holley*, 544 S.W.2d at

371–72. The couple are apparently engaged in counseling, and Mother testified Father should attend domestic violence classes so he will be "a better husband." They have been seen together at stores and in pictures on social media.

Neither the therapists nor the case worker believed reunification is appropriate, testifying the children's best interests would be served by terminating Father's and Mother's parental rights. *See* TEX. FAM. CODE ANN. § 263.307(b)(6) (results of psychiatric, psychological, or developmental evaluations of child or parents); *Holley*, 544 S.W.2d at 371–72. Mother's therapist specifically noted Mother demonstrated no change with regard to the goal of safety and security for the children. *See* TEX. FAM. CODE ANN. § 263.307(b)(6), (12); *Holley*, 544 S.W.2d at 371–72. Additionally, Mother's continued contact and interaction with Father, despite the prior abuse, was of great concern to Mother's therapist and the family therapist. *See* TEX. FAM. CODE ANN. § 263.307(b)(6), (7), (11); *Holley*, 544 S.W.2d at 371–72. Accordingly, Mother's therapist ranked Mother's progress in distinguishing between health and unhealthy relationships as "slight." *See* TEX. FAM. CODE ANN. § 263.307(b)(6), (7), (11), (12); *Holley*, 544 S.W.2d at 371–72. Mr. Chavez, the family therapist, also testified as to Mother's lack of progress, noting her continued drug use and the recent theft charge. *See* TEX. FAM. CODE ANN. § 263.307(b)(6), (8), (11), (12); *Holley*, 544 S.W.2d at 371–72. This behavior worries the two oldest children, resulting in insecurity. *See Holley*, 544 S.W.2d at 371–72. And although during therapy Mother "validated" Joe's memories of domestic violence, her testimony makes it clear both she and Father now refuse to admit its existence. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (11), (12); *Holley*, 544 S.W.2d at 371–72.

Ms. Flores, the case worker, stated Father showed little concern with his service plan requirements, failing to start, much less complete, any of the designated programs. *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11), (12); *Holley*, 544 S.W.2d at 371–72. Moreover, Father chose

a job that essentially negated any chance he might have of completing his service plan. *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11), (12); *Holley*, 544 S.W.2d at 371–72. And, although Mother completed most of the required programs and classes, she did not demonstrate she learned anything, failing to meet the goals set out in the service plan. *See* TEX. FAM. CODE ANN. § 263.307(b)(11), (12); *Holley*, 544 S.W.2d at 371–72.

Then, there is testimony regarding the feelings of the two oldest children, ten-year-old Joe and five-year-old Jane. *See* TEX. FAM. CODE ANN. § 263.307(b)(1) (child's age and vulnerabilities); *Holley*, 544 S.W.2d at 371–72. Joe expressed to his therapist and the case worker that he is afraid of Father, refusing to see him during visitation. *See* TEX. FAM. CODE ANN. § 263.307(b)(5) (child fearful of returning home); *Holley*, 544 S.W.2d at 371–72. Both children described physical violence in the home — hitting, slapping, hair pulling. *See* TEX. FAM. CODE ANN. § 263.307(b)(1), (5), (7), (12); *Holley*, 544 S.W.2d at 371–72. Yet, the parents deny these events entirely. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Outside of therapy, Mother would only go so far as to say Father pushed her toward a sofa on one occasion. *See* TEX. FAM. CODE ANN. § 263.307(b)(11), (12); *Holley*, 544 S.W.2d at 371–72. Father denied any physical abuse, admitting only to yelling and cursing. *See* TEX. FAM. CODE ANN. § 263.307(b)(11), (12); *Holley*, 544 S.W.2d at 371–72. Joe specifically advised Mother during therapy that he did not want her to reunite with Father, fearing more violence, and his Mother agreed she would not, but the evidence shows Mother has, at least to some extent, reunited with Father. *See* TEX. FAM. CODE ANN. § 263.307(b)(1), (5), (11), (12); *Holley*, 544 S.W.2d at 371–72. Mr. Chavez testified that if the parents' behavior is affecting the two oldest children, it likely affects the others, and given the current situation, returning the child to Father and Mother would not be beneficial to the children. *See* TEX. FAM. CODE ANN. § 263.307(b)(6); *Holley*, 544 S.W.2d at 371–72.

Finally, the evidence shows all five children are in a good foster home with a foster mother who has demonstrated an ability to care for and manage the children. *See Holley*, 544 S.W.2d at 371–72. Ms. Massey intends to adopt all five children, allowing them to stay together and providing them with "the best possible future." *See id.* The family therapist testified that staying with Ms. Massey permanently would be in the children's best interests. *See id*.

Recognizing that in making its best interest determination, the trial court was permitted to consider circumstantial evidence, subjective factors, and the totality of the evidence — in addition to the direct evidence presented — we hold the trial court was within its discretion in finding termination of both Father's and Mother's parental rights would be in their children's best interests. *See A.S.*, 2014 WL 5839256, at *2. In other words, the evidence is such that the trial court could have reasonably formed a firm belief or conviction that termination was in the children's best interests. *See J.P.B.*, 180 S.W.3d at 573.

## CONCLUSION

Based on our review of the evidence and application of the standards of review, we hold the evidence was legally and factually sufficient to permit the trial court to find termination of Father's and Mother's parental rights was in the best interests of the children. Accordingly, we overrule Father's and Mother's issues and affirm the trial court's termination order.

Marialyn Barnard, Justice