

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00197-CV

———————————————————

IN THE INTEREST OF L.T., T.G., M.G., D.G., M.J., J.J., CHILDREN

---

On Appeal from the 325th District Court
Tarrant County, Texas
Trial Court No. 325-424504-07

---

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant T.J. (Mother) appeals the termination of her parental rights to six of her children:[1] L.T. (Luke), T.G. (Tyler), M.G. (Martha), D.G. (Dylan), M.J. (Mary), and J.J. (Jaime) (collectively, the Children).[2] Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings (1) that she violated five statutory predicate grounds for termination under Texas Family Code Section 161.001(b)(1)—including the conduct-based endangerment ground under Subsection (E); and (2) that termination was in the best interest of the Children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (b)(1)(E), (b)(1)(N), (b)(1)(O), (b)(1)(R), (b)(2). We will affirm.

## I. Background

When Mother's rights were terminated in May 2022, the six Children ranged in age from 4 (Jaime) to 16 (Luke).[3] Mother's interactions with the Department of Family and Protective Services began more than four years earlier, while Mother was pregnant with Jaime.

---

[1]Because this is "a case in which the termination of parental right [i]s at issue," we use aliases to refer to minors. Tex. R. App. P. 9.8(b)(2).

[2]The fathers and alleged fathers of the six Children also had their rights terminated, but none of those fathers have filed appeals.

[3]When Mother's rights were terminated, Luke was 16 years old, Tyler was 15, Martha was 14, Dylan was 12, Mary was 10, and Jaime was 4.

## A.      Drugs

While pregnant with Jaime, Mother tested positive for amphetamines during a prenatal appointment.  And when she gave birth in May 2018, Jaime tested positive for drugs.  A Department investigator visited the hospital not long after Jaime's birth, and the investigator observed Jaime "experiencing severe withdrawal symptoms"—"she had a lot of issues with her heart rate[, s]he had some high blood pressure," she "visibly was shaking," and her skin "was very pale."  The withdrawal symptoms continued for several weeks.

Despite the newborn's positive drug test, Mother insisted that she had not used drugs, and she initially refused to be drug tested.  Later, though, Mother submitted to a drug test, and her test came back positive for amphetamines, methamphetamines, and cocaine.  According to the Department's investigator, Mother also "admitted to using Ecstasy every week for a very long period of time."

When Jaime was born, Mother already had nine other minor children living with her.[4]  Just six of the ten children are at issue in this appeal—Luke, Tyler, Martha, Dylan, Mary, and Jaime.[5]  A few weeks after Jaime's birth,[6] the Department sought to remove these six Children from Mother's home.

---

[4]Mother had at least two other children who were 18 years old or older.  And while this case was pending, Mother gave birth to another baby.  By the time of trial she had a total of at least 13 children (adults and minors).

[5]Regarding Mother's four other minor children, two of them were removed from the home at the same time as the six Children discussed herein, and in

3

## B.    Removal Order

In May 2018, the six Children were removed and placed in the Department's temporary conservatorship.  Less than two months later, the trial court entered an order specifying conditions for the Children to be returned to Mother's home, including requiring Mother to complete the Department's service plan for her.  That service plan directed Mother to, among other things, stop using illegal drugs, complete an assessment for drug treatment, submit to drug testing, and consistently visit her Children.

## C.    Abusive Home Environment

While the case was pending, two of Mother's Children—Martha and Dylan—outcried that, while living in Mother's home, they had been sexually abused by one of their older brothers.  A therapist spoke with Mother about the abuse, but Mother's caseworker testified that Mother did not take the allegations of abuse seriously.  And according to Martha and Dylan, Mother already knew about the abuse.

November 2019, their foster parents were appointed as their permanent managing conservators.  The other two minor children were not removed from Mother's home in 2018 because the Department believed the boys were "old enough to protect themselves inside the home."  One of those boys was later charged with murder, and the other was later accused of sexually assaulting his siblings.

[6]For the first few weeks after Jaime's birth, Mother and the Department agreed to a safety plan in which the Children continued to live in Mother's home and were cared for by two adult siblings.  For reasons that are not entirely clear, this arrangement did not work out, so the Department sought to remove the Children from the home.

Martha told her court-appointed special advocate (CASA) that when she had confided in Mother about the sexual abuse, Mother failed to believe or protect her. When Dylan told Mother about his abuse, he reported that Mother had temporarily grounded the abusive sibling, and the sibling then retaliated against Dylan.

Dylan also told his therapist that Mother had been physically abusive—that she had burned Dylan with an iron and whipped his siblings with electric cords. Mother did not deny this allegation or offer evidence to the contrary.

After Martha's and Dylan's reports of abuse came to light, the Department asked Mother to engage in additional counseling to supplement the initial counseling that Mother had completed when her Children were removed. Mother failed to reengage in therapy and was later dropped from the counseling service due to non-attendance.

## D.   Continued Drug Use

In the months after her Children were removed, Mother followed her service plan by completing a drug-and-alcohol assessment and an outpatient drug-treatment program, and she tested negative for drugs on two occasions. Then in September 2019, just months after finishing her drug-treatment program, Mother tested positive for methamphetamines.

After Mother's positive drug test, the Department referred her for another drug-and-alcohol assessment, but she failed to complete it. The Department referred Mother to a drug-education course, but she failed to complete that too. The

5

Department asked Mother to submit to further random drug tests, but Mother submitted to just one while refusing to take at least eight others. In March 2021, the trial court separately ordered Mother to submit to a drug test, but she again refused. Nonetheless, Mother denied that she was using drugs and "did not acknowledge [her] substance abuse."

## E.    Visitation

Mother completed the parenting education classes required by her service plan, and she attended "some" visits with the Children.[7] But she missed numerous other visits. According to Mother's caseworker, Mother explained her inconsistency by stating that "she was dealing with a lot of stuff with her older child and attending court hearings for him" because "he [had been] arrested for murder."[8]

On at least one occasion, Mother confirmed her visitation in advance and some of the Children traveled more than an hour to attend, but Mother did not show up. Mother's caseworker testified that the incident left Dylan "distraught," and his CASA described how "even though he had memory issues[,] he could tell you the exact dates of [Mother's] visits, when they were going to be," and he "would just be devastated" when she did not attend.

---

[7]The trial court's temporary orders permitted visitation "once a week for one hour."

[8]Mother also reported transportation issues on one occasion. She was offered a virtual visit with her Children to avoid the transportation issues, but according to the caseworker, Mother "wasn't able to attend" the virtual visit either.

6

By the time of Mother's termination trial in May 2022, she had not seen the Children in approximately six months.

## F.    Termination Order[9]

After considering the evidence, the trial court entered an order finding that Mother had violated five statutory predicate grounds for termination:  she had (1) "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger[ed] the[ir] physical or emotional well-being," (2) "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endanger[ed] the[ir] physical or emotional well-being," (3) "constructively abandoned the[m]," (4) "been the cause of [Jaime] being born addicted to alcohol or a controlled substance," and (5) "failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the [C]hildren."  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (b)(1)(E), (b)(1)(N), (b)(1)(O), (b)(1)(R).  Based on these findings, together with a finding that termination was in the Children's best interest, the trial court terminated Mother's parental rights to all six Children.

---

[9]In November 2019, more than two years before Mother's termination trial, the Department was appointed as the Children's permanent managing conservator, and Mother was appointed possessory conservator.  However, the Department retained the long-term goal of returning the Children to Mother or to another relative.  The trial court entered subsequent orders reiterating the requirement that Mother comply with the Department's service plan.  In June 2021, the Department filed a new petition seeking termination of Mother's parental rights to the six Children.

7

## II. Sufficiency Challenges

In six issues, Mother challenges the legal and factual sufficiency of each of the trial court's five predicate findings and of the trial court's best interest finding.

### A.      Standard of Review

To terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence:[10]  (1) that the parent's actions satisfy at least one statutory predicate ground listed in Family Code Section 161.001(b)(1) and (2) that termination is in the child's best interest.  *Id.* §§ 161.001(b)(1), .206(a), (a–1); *J.F.-G.*, 627 S.W.3d at 312; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Clear and convincing evidence of just one statutory predicate ground, together with a best interest finding, will support a termination order.  *In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022); *In re N.G.*, 577 S.W.3d 230, 232–33 (Tex. 2019).

When reviewing the sufficiency of clear-and-convincing termination findings, we ask whether a reasonable factfinder could have formed a firm belief or conviction that the challenged finding was true.  *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020).  Both legal and factual sufficiency turn on this question; the distinction between the two "lies in the extent to which disputed evidence contrary to a finding may be considered" in answering the question.  *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

---

[10]Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007; *In re J.F.-G.*, 627 S.W.3d 304, 311 n.14 (Tex. 2021).

In our legal sufficiency analysis, we "look at all the evidence in the light most favorable to the finding," assuming that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so and disregarding all evidence that a reasonable factfinder could have disbelieved. *Z.N.*, 602 S.W.3d at 545; *A.C.*, 560 S.W.3d at 630–31. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding" to determine if "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review."). Neither sufficiency analysis allows us to supplant the factfinder's judgment with our own; the factfinder remains the sole arbiter of the credibility and demeanor of witnesses. *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006); *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *8 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.).

The legal and factual sufficiency analyses contain many overlapping elements, and if the evidence is factually sufficient, it is necessarily legally sufficient. *A.O.*, 2022 WL 1257384, at *8. Therefore, and because Mother challenges both factual and legal sufficiency, we review them together.

## B. Statutory Predicate Grounds

The trial court found that Mother violated five statutory predicate grounds, and Mother challenges the sufficiency of all five findings. But "[t]o affirm a termination judgment on appeal, a court need uphold only one [predicate] termination ground." *In re A.N.*, No. 02-22-00036-CV, 2022 WL 2071966, at *2 (Tex. App.—Fort Worth June 9, 2022, pet. denied) (mem. op.) (quoting *N.G.*, 577 S.W.3d at 232). Therefore, we need only address one predicate finding: the trial court's Subsection (E) predicate finding that Mother endangered her Children by her conduct, which Mother challenges in her second issue.[11] Tex. Fam. Code Ann. § 161.001(b)(1)(E).

### 1. Applicable Law: Conduct-Based Endangerment

A parent's rights may be terminated under Subsection (E) if the trial court finds that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* To "'[e]ndanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.O.*, 2022 WL 1257384, at *8.

---

[11]Because the trial court's endangerment findings under Subsections (D) and (E) "can serve as predicate grounds for terminating Mother's parental rights to other children, *see* [Tex. Fam. Code Ann.] § 161.001(b)(1)(M), . . . we must address at least one of the two challenged endangerment findings, even [if] the findings may not be dispositive." *A.N.*, 2022 WL 2071966, at *2.

Endangerment under Subsection (E) requires a "voluntary, deliberate, and conscious course of conduct" rather than "a single act or omission." *A.O.*, 2022 WL 1257384, at *9 (quoting *In re J.B.*, No. 02-21-00239-CV, 2021 WL 6144074, at *21 (Tex. App.—Fort Worth Dec. 30, 2021, no pet.) (mem. op.), and *In re B.K.*, No. 02-21-00175-CV, 2021 WL 5848769, at *4 (Tex. App.—Fort Worth Dec. 9, 2021, pet. denied) (mem. op.)). As a course of conduct, evidence of endangerment under Subsection (E) "is not limited to actions directed towards the child," nor is it limited to the parent's pre-removal actions. *A.O.*, 2022 WL 1257384, at *9 (quoting *J.F.-G.*, 627 S.W.3d at 315 n.43); *In re M.W.*, No. 02-21-00146-CV, 2021 WL 3679247, at *4 (Tex. App.—Fort Worth Aug. 19, 2021, pet. denied) (mem. op.). Rather, the trial court may consider actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody because all such actions may "create an inference that similar conduct could recur and further jeopardize a child's well-being." *M.W.*, 2021 WL 3679247, at *4; *see J.O.A.*, 283 S.W.3d at 345–46; *In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.).

### 2. Mother's Endangering Conduct

Although Mother purports to challenge the sufficiency of the trial court's finding under Subsection (E), she does not explain why her conduct did not endanger her Children. The record shows that Mother's course of conduct endangered the Children by, among other things, (1) exposing them to a credible risk of sexual

11

abuse;[12] (2) abusing them physically;[13] (3) using drugs while she was pregnant with Jaime, while the other five Children were still in her care, and while the termination case was pending;[14] and (4) failing to consistently visit her Children.[15] On this record

[12]"Sexual abuse is conduct that endangers a child's physical or emotional well-being." *In re G.M.*, 649 S.W.3d 801, 809 (Tex. App.—El Paso 2022, no pet.); *cf. In re T.M.*, No. 07-20-00134-CV, 2020 WL 5507826, at *5–6 (Tex. App.—Amarillo Sept. 11, 2020, pet. denied) (per curiam) (mem. op.) (affirming Subsection (E) finding based in part on evidence that mother attempted to convince children to recant outcries of abuse). And a court may infer that sexual abuse of one child "will endanger the physical and emotional well-being of other children in the home who may either discover the abuse or be abused themselves." *In re E.A.G.*, 373 S.W.3d 129, 143 (Tex. App.—San Antonio 2012, pet. denied).

[13]By definition, a parent's physical abuse of a child harms that child's physical well-being. And the parent's abusive conduct toward one child presents a similar risk of harm to the other children in the home. *See In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at *7 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.) (affirming sufficiency of Subsection (E) finding based in part on evidence that mother threw a chair at one child and forced the other to stand on the balcony overnight).

[14]"[B]ecause '[n]arcotics can impair or incapacitate the user's ability to parent,' Mother's 'use of a mind-altering, illegal substance while [she was or should have been] caring for [the Children] jeopardized or exposed [them] to loss or injury.'" *A.N.*, 2022 WL 2071966, at *4 (first quoting *In re M.M.*, No. 02-21-00185-CV, 2021 WL 5227177, at *6 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.); and then quoting *In re M.D.V.*, No. 14-04-00463-CV, 2005 WL 2787006, at *4 (Tex. App.—Houston [14th Dist.] Oct. 27, 2005, no pet.) (mem. op.)). Furthermore, "[a] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding [of endangering conduct]." *A.N.*, 2022 WL 2071966, at *4 (quoting *C.Y.*, 2022 WL 500028, at *3).

[15]"A parent's inconsistent visitation 'can be very damaging' to a child, and 'can emotionally endanger a child's well-being, supporting termination under [S]ubsection (E).'" *A.N.*, 2022 WL 2071966, at *5 (first quoting *In re S.I.H.*, No. 02-11-00489-CV, 2012 WL 858643, at *6 (Tex. App.—Fort Worth Mar. 15, 2012, no pet.) (mem. op.); and then quoting *D.L.G. v. Tex. Dep't of Fam. & Protective Servs.*, Nos. 03-20-00314-CV, 03-20-00315-CV, 2020 WL 6789208, at *5 (Tex. App.—Austin Nov. 19, 2020, no

a reasonable factfinder—whether viewing the evidence in the light most favorable to the judgment or weighing all of the disputed evidence, *see A.C.*, 560 S.W.3d at 630–31—could have formed a firm belief or conviction that Mother's course of conduct endangered the Children's well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E). We overrule Mother's second issue and affirm the trial court finding of conduct-based endangerment under Subsection (E). *Id.*

And because the evidence is legally and factually sufficient to support the trial court's Section 161.001(1)(E) finding, we need not address Mother's other issues that challenge whether the evidence is sufficient to support the trial court's other predicate findings. *See* Tex. R. App. P. 47.1; *In re M.E.-M.N.*, 342 S.W.3d 254, 264 (Tex. App.—Fort Worth 2011, pet. denied).

## C.     Best Interest

Mother's final issue challenges the legal and factual sufficiency of the trial court's finding that termination was in the Children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

---

pet.) (mem. op.)); *see C.Y.*, 2022 WL 500028, at *6 (affirming Subsection (E) finding based in part on failure to consistently attend visitation). Emotional endangerment was not merely a hypothetical risk in this case—the Children's CASA described how Mother's failure to attend visitation left Dylan "devastated even though it had happened repetitively each time."

### 1. Applicable Law: Best Interest

The best interest inquiry "is child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631; *see In re A.S.*, No. 02-19-00429-CV, 2020 WL 2071944, at *7 (Tex. App.—Fort Worth Apr. 30, 2020, pet. denied) (mem. op.). Although "there is a strong presumption that the best interest of a child is served by keeping the child with a parent," *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), that presumption may be overcome by clear and convincing evidence to the contrary. *A.O.*, 2022 WL 1257384, at *13; *cf. In re C.H.*, 89 S.W.3d 17, 23–26 (Tex. 2002) (emphasizing that "[w]hile parental rights are of constitutional magnitude, they are not absolute").

In our review of a best interest finding, we consider several factors, including (1) the desires of the child; (2) the emotional and physical needs of the child; (3) the emotional and physical danger to the child; (4) the parental abilities of those seeking custody; (5) the programs available to assist those seeking custody; (6) the plans for the child by those seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent indicating that the parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing additional factors). These factors are neither exhaustive nor exclusive, and not all factors apply in all cases. *C.H.*, 89 S.W.3d at 27; *A.O.*, 2022 WL 1257384, at *14.

## 2.     The Children's Best Interest

Mother's caseworker testified that, at the time of trial, the six Children were doing well in foster care. *See Holley*, 544 S.W.2d at 371–72 (listing best interest factors including the plans for the child, the stability of the placement, and the emotional and physical needs of the child).

The youngest two Children, Mary and Jaime, were placed together in a foster community. The girls had the same sponsor family, and that family was interested in adopting them. Mary was doing well in school and enjoying dance classes. Jaime had just turned four at the time of trial, and she was excited to start taking dance classes as well.

Dylan was placed with his younger sisters in the foster community, but he had a different sponsor family. He had been diagnosed with brain malformations and had required speech therapy, occupational therapy, physical therapy, behavioral therapy, school accommodations, counseling, and general assistance with his daily routine. His sponsor family had been the first to raise concerns regarding Dylan's developmental delays, and they made sure that he received the help that he needed.

Tyler lived in the foster community as well, but he was in a different unit than his younger siblings. Tyler's sponsor family was one of his schoolteachers, and the teacher had an interest in caring for Tyler in the future. Tyler was engaging in individual and behavioral therapy, and he was active in sports. Tyler even made the

varsity football team as a sophomore. But Mother had not taken an interest in his activities, and she had not attended any of his games.

Martha was placed in a foster home separate from her siblings. Relatively early in the termination case, she experienced what the State described as a "mental breakdown"—she hid in the closet and refused to come out, she refused to go to school for weeks at a time, she refused to eat or shower, and she had a panic attack during which she could not stop shaking. By the time of trial, though, Martha had completed a psychological treatment program and was "blossoming" with her foster family. She enjoyed a good relationship with her foster siblings, and she was attending therapy, communicating her feelings, and socializing more than she had previously. The foster family had indicated that they were willing to care for Martha long-term.

The oldest of the six Children, Logan, was also living with a separate foster family. His foster brother was his best friend, and the foster parents—who attended Mother's termination hearing—wanted to adopt Logan. Logan had been doing so well with his foster family that the Department indicated that he could stop attending counseling. Logan played numerous sports, but Mother had not shown an interest in any of his activities.

Although Mother's caseworker testified that Logan was the only one of the six Children who was "in an adoption-motivated placement" at the time of trial, she confirmed that the family sponsoring Mary and Jaime was "interested in adopt[ion],"

that Martha's foster family was "willing to keep her long term," and that Tyler's foster family was being "explor[ed] . . . as a future possible placement." The caseworker also indicated that she intended to work with CASA to find adoptive homes for all of the Children, with the goal of finding homes that would adopt "sibling clusters."

Mother, on the other hand, did not attend the trial, and her proposed plans for the Children were unclear. *Cf. Holley*, 544 S.W.2d at 371–72 (listing best interest factors including the plans for the child). Mother was living with her stepfather at the time of trial,[16] and although there was no evidence that the living situation was particularly unstable, there was also no evidence that it was suitable or available to house and care for the six Children. *Cf. id.* (listing best interest factors including the physical needs of the child). Nor was there evidence that Mother had a job or access to the financial resources necessary to meet the Children's needs. And although Mother had initially taken advantage of several Department-provided assistance services, she had stopped doing so around the same time that she tested positive for drugs, in late 2019. Thus, in the two years preceding her termination trial, Mother had not demonstrated a willingness to take advantage of the services available to assist her—even though many of those services were conditions for her Children's return. *Cf. id.* (listing best interest factors including the parent's abilities and the programs

---

[16]Mother's caseworker described the home as "cluttered" and said that it "ha[d] a strong smell of tobacco." But neither clutter nor cigarettes, standing alone, warrant a finding that termination is in a child's best interest.

17

available to assist); *In re T.M.*, No. 02-22-00070-CV, 2022 WL 2527627, at \*10 (Tex. App.—Fort Worth July 7, 2022, no pet.) (mem. op.) (conducting best interest analysis and noting that mother's "noncompliance with the service plan weighed in favor of terminating Mother's parental rights").

There was also evidence that Mother had a pattern of drug use and that she was refusing to submit to drug tests, presumably because she would have tested positive. *See A.N.*, 2022 WL 2071966, at \*4. As addressed above, this pattern of drug use endangered her Children's physical and emotional well-being and posed a danger to the Children if they were returned to her care. *See T.M.*, 2022 WL 2527627, at \*9–10 (conducting best interest analysis and noting that trial court could weigh mother's continued use of illegal drugs in favor of termination); *In re M.H.*, No. 02-22-00048-CV, 2022 WL 2840266, at \*2–3, 6 (Tex. App.—Fort Worth July 21, 2022, no pet.) (mem. op.) (conducting best interest analysis and noting that mother's pattern of marijuana and cocaine use and her failure to submit to drug tests supported termination); *cf. Holley*, 544 S.W.2d at 371–72 (listing best interest factors including parental actions and the emotional and physical danger to the child).

Mother's drug use also reflected a dysfunctional parent–child relationship because Mother could not or would not maintain the sobriety necessary to provide for her Children's physical and emotional needs. *Cf. Holley*, 544 S.W.2d at 371–72 (listing best interest factors including parental actions that indicate an improper parent–child

18

relationship); *A.N.*, 2022 WL 2071966, at *4 (noting in conduct-based endangerment context that narcotics can impair a person's ability to parent).

The same is true of the evidence that Mother had physically abused her Children by burning and whipping them—it demonstrated not only conduct-based endangerment, but also a dysfunctional parent–child relationship and a failure to care for the Children's needs. *Cf. Holley*, 544 S.W.2d at 371–72 (listing best interest factors including the emotional and physical danger to the child, the parental actions that indicate an improper parent–child relationship, and the parental abilities of those seeking custody); *M.H.*, 2022 WL 2840266, at *3, 6 (conducting best interest analysis and noting Mother's failure to protect child from abusive boyfriend as weighing in favor of termination). Indeed, physically abusing a child epitomizes the failure to care for the child's physical needs.

The Children's desires also indicated that termination was in their best interest. *See Holley*, 544 S.W.2d at 371–72 (listing best interest factors including the desires of the child) Logan expressed to his CASA and to Mother's caseworker that he wanted his foster family to adopt him. And Tyler and Martha had asked that they no longer be forced to attend visits with Mother.[17]

---

[17]Martha in particular was "[v]ery adamant" that she did not want to see Mother. On one occasion, the prospect of a visitation left Martha balled up in a corner, shaking.

Based on our exacting review of the record, whether we view the evidence in the light most favorable to the judgment or weigh all of the disputed evidence, *see A.C.*, 560 S.W.3d at 630–31, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination was in the Children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We overrule Mother's sixth issue.

## III. Conclusion

The record contains legally and factually sufficient evidence to allow a reasonable factfinder to form a firm belief or conviction that Mother endangered the Children by her conduct and that termination was in the Children's best interest. *Id.* § 161.001(b)(1)(E), (b)(2). We therefore overrule Mother's dispositive second and sixth issues, and we affirm the trial court's judgment. Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: October 27, 2022